THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
NANCY D. RISH, Defendant-Appellant.

Third District   No. 3—88—0849

Opinion filed January 31, 1991.

Catherine Fitzsimmons and Robert Agostinelli, both of State Appellate Defender's Office, of Ottawa, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Arleen C. Anderson and Thomas L. Ciecko, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

Following a jury trial, defendant Nancy D. Rish was convicted of first degree murder and aggravated kidnapping. Rish was subsequently sentenced to a term of natural life imprisonment for murder and a concurrent 30-year sentence for aggravated kidnapping. The defendant appeals her convictions and sentences. We affirm.

On September 2, 1987, Stephen B. Small, a wealthy resident of Kankakee, Illinois, was the victim of a kidnapping-for-ransom scheme. A ransom demand was made to the Small residence. Small's wife contacted Small's sister, who then contacted the police. Shortly thereafter, State and Federal law enforcement authorities began investigating the crime. Suspicion soon focused on two individuals, Danny Edwards and Nancy Rish. Edwards and Rish lived together in a townhouse in Bourbonnais. On September 3, 1987, the police obtained a search warrant to search the townhouse. At approximately 10:30 a.m. on September 4, 1987, the police executed the search warrant, during the course of which the defendant and Edwards were taken into custody. During the evening of September 4, 1987, Edwards took the police to a rural area where police officers recovered Small's body.

Small had been bound, placed in a wooden box and buried alive. In addition to Small's body, the box contained a light connected to one of two automobile batteries, a one-gallon jug of water, candy bars, gum, a flashlight and PVC piping which came up out of one end of the box. Attached to each of Small's wrists was a single handcuff. There were also superficial abrasions on his legs. The cause of death was determined to be "asphyxia due to suffocation."

On October 1, 1987, the defendant was charged with three counts of first degree murder and several counts of aggravated kidnapping alleging in various forms the kidnapping and murder of Small. The defendant successfully moved to separate her trial from Edwards' trial and for a change of venue. Various other pretrial motions, including a motion to quash the arrest, a motion to quash the search warrant, a motion to suppress the defendant's custodial statements and several motions *in limine* were also made by the defendant. Following various hearings on the motions, they were all denied.

A jury was selected in Rockford on October 19 and 20, 1988. The trial began on October 24, 1988, in Kankakee County. During opening statements, the prosecutor indicated that the State's case was one of accountability; that the defendant promoted, aided and facilitated Edwards in the kidnapping and eventual murder of Small. Defense counsel argued that the defendant was not aware of what Edwards was

doing and that the physical evidence did not tie the defendant to the victim or the crime scene.

Evidence at trial established that at approximately 12:30 a.m. on September 2, 1987, Ramsey Small, the 15-year-old son of the victim, answered the phone at his parent's residence. A deep voice that he did not recognize identified the caller as being with the Kankakee police department. The caller indicated that there had been a break-in at the Bradley House, a Frank Lloyd Wright-designed house Stephen Small owned and was restoring. The caller asked to speak to Stephen Small and, after awakening his father, Ramsey returned to his room. Shortly thereafter, Ramsey saw his father walk past his room and then heard the garage door open and close.

The phone rang again at approximately 3:30 a.m. Ramsey picked up the phone which had moments before been answered by his mother, Nancy Small. Ramsey testified that the voice he heard was different from the 12:30 caller's voice. Ramsey heard the caller say that Stephen Small was being held for ransom of $1 million and that the family was not to contact the FBI or the police. Mrs. Small then heard her husband's voice. Stephen Small indicated that this was not a joke, that he was in what appeared to be a box that was covered with a lot of sand and that there would be enough air for 24 or 48 hours. Mrs. Small contacted Stephen Small's sister, Sue Bergeron, and told her what had occurred. Mrs. Bergeron then contacted the FBI and police, who began to investigate the crime.

FBI Special Agent Oren L. Lucas testified that he had a trap and trace placed on the Small telephone on September 2, 1987. A trap and trace allows the police to determine the location of the caller. At approximately 5:05 p.m. on September 2, 1987, a call was made to the Small residence. The caller inquired how much money Mrs. Small had obtained. Mrs. Small was not allowed to speak to her husband and was told that she would receive a call later in the evening. This call was traced to the Tri-Points Phillips 66 gas station in Aroma Park. Surveillance of the Aroma Park area was established.

Terry Dutour, a resident of Aroma Park who has known Danny Edwards for a number of years, testified that while driving home around 5 p.m. on September 2, 1987, he observed Edwards at a pay phone near the Phillips 66 station. There was a vehicle parked near the telephone with a white female with blond hair sitting in it. The vehicle was parked six to eight feet away from the phone booth, and Edwards had his back to the vehicle as he spoke.

At approximately 11:30 p.m. that same evening, another call was made to the Small residence. This time the caller played a tape re-

cording of Stephen Small's voice, giving instructions on where to drop off the ransom money. The caller then asked Mrs. Small if she had understood the directions and became impatient with her when she asked for clarification. The call was terminated. At approximately 11:38 p.m., there was another call made to the Small residence. The same person who had called a few minutes earlier had advised Mrs. Small that she had "fucked up" and accused her of having called the police.

During the evening hours of September 2, 1987, FBI Special Agent Michael Evans and his partner were maintaining surveillance of two of the three public pay phones in the Aroma Park area. At approximately 11:30 p.m. they received a radio message from the police dispatch that advised that a call currently being made to the Small residence was coming from a pay phone in the Aroma Park area. The call was not being made from either of the phones under surveillance, so Evans and his partner went to the third phone, arriving there approximately 30 seconds after receiving the radio dispatch. Evans observed a white male wearing a red and white jacket using the phone. Evans also observed a dark-colored car, with Illinois license plate number SZG 507, parked approximately 15 feet from the telephone. A white female with light blond hair was sitting in the driver's seat. The agents watched as the male entered the car, then they followed the car as it proceeded out of town. A search of the motor vehicle records revealed that the car was registered to the defendant.

Agent Lucas testified that on September 2, 1987, at approximately 11:50 p.m., he and Special Agent Dave Buhrmester of the Illinois State Police/Division of Criminal Investigation observed a dark blue automobile, Illinois license plate number SZG 507, heading south toward the Village of Aroma Park. The trunk of the automobile was ajar.

FBI Special Agent Elizabeth Lamanna testified that at approximately 12:30 a.m. on September 3, 1987, she and her partner were exiting the parking lot of the Convenient Food Mart in Aroma Park when she observed a blue Buick drive past. The passenger was a white female, in her early twenties, with blond hair. The woman, who turned and looked at Agent Lamanna, had a look of "fright or panic" on her face. When the car had passed by, the blond woman turned completely around and looked out the back window. Agent Lamanna later identified this woman as being the defendant.

Special Agent John Russell of the Illinois State Police/Division of Criminal Investigation testified that during the early morning hours of September 3, 1987, he was requested to drive by the residence lo-

cated at 756 East Stratford Drive in Bourbonnais, Illinois, and look for a vehicle with Illinois license plate SZG 507. Agent Russell and his partner did not observe that vehicle, but did see a white van parked across the street from the residence. Agent Russell identified Edwards' van as being the van that was located across from the residence that evening.

Surveillance was established in the parking lot of an apartment complex located approximately 50 to 75 yards away from the residence. At approximately 1:19 a.m., Agent Russell observed a vehicle with Illinois license plate SZG 507 parked in the driveway of the residence. Agent Russell identified the defendant's car as being the same car he saw in the driveway.

According to Agent Russell, there were two occupants in the car, a white male later identified as Danny Edwards and a white female later identified as the defendant. Agent Russell positively identified the defendant as the woman he had seen in the car that morning.

Agent Russell further testified that Edwards removed a bicycle from the trunk of the car. At approximately 1:40 a.m. that same morning, Edwards exited the residence and drove off in the white van. An FBI agent followed Edwards, who went to a grocery store and a gas station. Edwards made a phone call at a public pay phone at the gas station before returning to the residence.

Edwards and the defendant were kept under surveillance from that point forward. During the morning of September 3, 1987, garbage was being picked up in the defendant's neighborhood. The police made contact with the garbage truck driver and asked him to empty his hopper prior to going into the defendant's neighborhood and then meet them at a prearranged location. The garbage truck driver complied. While stopped at the defendant's house, Edwards came out and gave the garbageman a trashbag. The garbageman threw this bag, as well as three bags already on the curb, into the hopper. Several items were discovered after the police examined the hopper, including a paper bag containing gloves, a receipt to Danny Edwards from Radio Shack for one audio tape cassette and some electrical straps, which are of the type also used by police as handcuffs. Also observed but not recovered was a caulking gun and a saw.

A search warrant for the townhouse was obtained later in the day. The search warrant was executed at approximately 10:30 a.m. on September 4, 1987. Both Edwards and the defendant were taken into custody. Recovered from the residence were a pair of man's boots found in the utility room behind the washer and dryer, a 1986 Kankakee phone directory with the Small's name circled at the top of page

20, a putty knife with traces of a clear glue-like substance, a notebook and automobile keys.

The defendant was transported to the Bourbonnais police station. During the days of September 4 to September 8, 1987, the defendant gave the following eight statements to police:

(1.) September 4, 1987, 11 a.m. The defendant denied knowing anything about a ransom call made from Aroma Park during the night of September 2, 1987. The defendant indicated that at about 11 p.m. on September 2, 1987, she and Edwards went to Edwards' friend Jack's house in her car to get her bicycle repaired. En route to Jack's house, they stopped at a phone booth located near a gas station in Aroma Park where Edwards got out and called Jack to see if he was home. At this point, the defendant was advised of her *Miranda* rights. The defendant waived her rights and continued with her statement.

The defendant indicated that after Edwards called Jack, they drove past Jack's house. Because there were no lights on, they continued on. The defendant stated that Edwards told her that Jack was not home because he was working a second shift.

As to the events of September, 1, 1987, the day preceding the kidnapping, the defendant indicated that she was home until 5 p.m. At that time she took her son to football practice, picked him up at 7 p.m., and helped him with his homework until 10:30 p.m. She did not know if Edwards had gone anywhere that evening because she slept upstairs and he slept downstairs on the couch. The defendant indicated that she wanted to terminate the interview and consult with an attorney.

(2.) September 4, 1987, 2:30 p.m. Questioning resumed when the defendant's counsel appeared. During this statement, the defendant indicated that on Sunday evening (August 30, 1987) at approximately 6:30 p.m. she had a call from someone who asked for Danny. When she asked the caller's identity, he stated "What's it to you?" and hung up. That same type of call occurred again on September 1, 1987.

At 10:30 p.m. on September 1, 1987, the defendant indicated that Edwards left the duplex in his van. She went out to look for him at 11:30 p.m. because she thought he was cheating on her. She returned without finding him at approximately 12 midnight on September 2, 1987. She indicated that she again left the residence at between 1:30 and 2 a.m. to again look for him. Edwards was at the residence when she returned.

During the afternoon of September 2, 1987, she took her dog to get clipped. The defendant substantially repeated her account of tak-

ing the bike to Jack's house, adding that after they passed Jack's house, they drove to the Marathon gas station in Kankakee where Edwards made a phone call. According to the defendant, it took approximately one-half hour for them to travel from the gas station in Aroma Park to the gas station in Kankakee. She further indicated that on the morning of September 3, 1987, Edwards left the residence for breakfast.

The police asked the defendant to take them on the same route that she and Edwards took had travelled on September 2, 1987. The route the defendant took to the phone booth in Aroma Park was the same route she had described in her statement. The route that she took from that pay phone to the one at the Marathon gas station in Kankakee was a different route from the one described in her statement.

A ground search of a rural area just north of Aroma Park, along the route the defendant showed police after her second statement, yielded several items. These items consisted of several feet of cassette tape, several small pieces of cassette tape, one side of a Radio Shack brand cassette tape housing, the other side of a cassette tape housing and a bag containing pieces of tape and one cassette tape.

(3.) September 4, 1987, 7 p.m. After returning to the police station, the police asked her to give another statement. The defendant added that when she went to look for Edwards the second time, during the early hours of September 2, 1987, she looked in the Aroma Park area.

(4.) September 6, 1987, 12 p.m. After the defendant was advised that Small's body had been recovered, police asked her if she knew anything about a box. The defendant indicated that Edwards had built a large wooden box in the garage of their residence. The defendant indicated that Edwards had given her two reasons for building the box. The first was that he was going to give it to his brother. The second was that it was to be used to store firewood. The defendant also told the police that in May or June 1987 Edwards sold the box to a heavyset black man who had purchased their dryer.

The defendant further indicated that after she and Edwards picked up the dog from the dog groomer's, Edwards directed her to the Tri-Points Phillips 66 gas station in Aroma Park where he made a phone call at approximately 5 p.m.

(5.) September 7, 1987, 11 a.m. The defendant stated that after she and Edwards dropped the dog off at the dog groomer's at 2 p.m. on September 2, 1987, Edwards asked her if she wanted to see some horses. They then drove to a place where some black people own a rodeo.

The defendant denied knowing anything about a tape recorder being used in any of the calls made by Edwards. The defendant started to cry and dropped her head into her hands when she was told that her fingerprints were on a tape recorder they had found. The defendant indicated that she had lied to the police about the tape recorder; that Edwards' son had left it in their duplex and that she had moved it either upstairs or downstairs.

The defendant further testified that there was an old car battery in the duplex and that Edwards had purchased another one from a junkyard on Route 113 on August 31, 1990.

The police concluded the interrogation by telling the defendant that her son had indicated that he had seen the box in the garage of their duplex on August 30, 1987, and questioned the defendant as to whether she was calling her son a liar.

(6.) September 7, 1987, 8:30 p.m. The defendant admitted that the box had not been sold to a black man and that the last time she saw it was on August 31, 1987.

The defendant indicated that during the afternoon of September 1, 1987, Edwards took her to a location where he wanted her to pick him up at 3 a.m. the next morning.

Late on September 1, 1987, or early September 2, 1987, Edwards had her follow him to Greenwood Avenue. He then got into her car and had her drive him to Cobb Park. Cobb Park is located one block away from the Small residence. She went home and picked him up from the above-mentioned location at 3 a.m. She drove him back to his van, parked on Greenwood Avenue, and returned home. Edwards was already there when she arrived.

The defendant indicated that she never got out of the car on September 2, 1987, to look at horses, rather she just dropped off Edwards and picked him up about one hour later. Police were aware that this was the rural area where Small's body was eventually recovered.

The defendant reported that she saw the tape recorder in the car on the night of September 2, 1987 and that Edwards took it with him when he went to make his 11:30 p.m. phone call. The defendant told the police where this tape recorder was discarded, but when the area was searched, it was not recovered.

Between the 11:30 p.m. phone call and the 11:50 p.m. phone call, they stopped along Pottinger Road where Edwards hid a duffle bag in some evergreens. She admitted that instead of going to breakfast on September 3, 1987, Edwards went out and picked up the duffle bag.

The defendant further indicated that on August 30, 1987, she and Edwards got into an argument when he returned late to their resi-

dence. Edwards ran upstairs, got a gun, pointed it at his head and indicated that he was going to kill the defendant, the defendant's son, and himself.

(7.) September 8, 1987, 9:30 a.m. The defendant added that during the early hours of September 2, 1987, after she followed Edwards to Greenwood Avenue and picked him up, she drove him to the Phillips 66 gas station in Kankakee where he made a phone call about 12:30 a.m.

The defendant also admitted that there was a pair of bolt cutters at her duplex.

(8.) September 8, 1987, evening. The defendant indicated that there wasn't a pair of bolt cutters at her duplex.

The defendant stated that Edwards pointed the gun at her head, not his head, during the argument on August 30, 1987.

The State produced substantial forensic evidence which linked Edwards to the crime. Edwards' fingerprints were found on both PVC piping and duct tape recovered from the burial box. Sand scraped from a pair of boots found behind a washer and dryer at the defendant's and Edwards' residence, as well as sand recovered from the interior of Edwards' van, matched a sand sample taken from the burial site. White caulking material found on gloves recovered from Edwards' and Rish's trash had the same chemical composition as the sample of white caulking material taken from the burial box. Cross-examination of various State witnesses revealed that there was no physical evidence which linked the defendant to either the victim or the crime scene.

The State presented witnesses that tended to demonstrate that the defendant was aware that the victim was quite wealthy and that the defendant knew where the victim lived, as she had previously resided only blocks away from the Small residence. Additionally, there was testimony that the defendant had lived off the money generated by Edwards' drug dealing and that his arrest in January 1987 for that offense resulted in things being "tight" financially.

The State also presented evidence that the defendant was seen in the vicinity of the Small residence both prior to the crime and on September 2, 1987.

Karen Thacker, a former neighbor of Stephen Small, testified that approximately 8 to 10 times during the summer of 1987, she saw a light-colored van with a tire on back, which looked like Edwards' van, drive through the alley which separates her home from the Small residence. One morning in August 1987, Mrs. Thacker saw the van stopped in the middle of the alley. Facing the front of the van from a

distance of approximately five feet, Mrs. Thacker saw a white, blond-haired woman sitting in the passenger seat and a white male in the driver's seat. Mrs. Thacker's attention was focused on the woman, who first looked at her, then at the driver and finally back to her. Mrs. Thacker testified that the woman looked "startled." When Mrs. Thacker saw the van on earlier occasions that summer, she noticed then as well that it was occupied by a man and a blond woman. Mrs. Thacker further testified that the day after she discovered that Stephen Small had been kidnapped and murdered, she informed a law enforcement official of what she had seen. Later, after viewing newspaper photographs and television accounts depicting the defendant, Mrs. Thacker recognized the defendant as being the woman in the van on that August day. Mrs. Thacker positively identified Rish in court as being the woman she had seen in the van.

Caroline Mortell, a friend of the Small family and a resident on the same block as the Smalls, testified that from her den window she is able to see the Small residence. At approximately 11 a.m. on September 2, 1987, Mrs. Mortell was looking out her den window when she saw a white van with large vertical windows on the driver's side proceeding toward her home. The van stopped at the intersection in front of her home, and Mrs. Mortell saw that it was occupied by just one person—a woman in her late twenties or early thirties, with blond hair and a dark complexion or make-up. The woman seemed to be "looking around the area." As Mrs. Mortell continued to watch, the van turned left and proceeded toward the Small home. Later that same afternoon, between 1:30 and 3:30 p.m., Mrs. Mortell thought she saw the same van once or twice again in the same area, proceeding toward the Small house. Mrs. Mortell made an in-court identification of a picture of Edwards' van as being the van she saw driving on the street that day.

Mrs. Mortell further testified that some time later, she was asked to view a series of photographs of women who had their faces covered by tape. The purpose of this was to determine whether she could select the hair style of the woman driving the van on September 2, 1987. When shown the same six photographs in court, Mrs. Mortell identified photograph number 4 as the one she had previously selected as depicting the same hair style of the woman driving the van. The photograph was of the defendant.

The State also presented the testimony of several witnesses who had seen the defendant or a woman similar to the physical description of the defendant with Edwards or a man similar to the physical description of Edwards procuring various items in preparation for the

crime. These witnesses included Linda Forestier, a clerk at a hardware store in Aroma Park. Ms. Forestier testified that a man and a woman entered the store together on or about August 31, 1987. The man was about 5 feet 7 inches or 5 feet 8 inches, 160 pounds with dark hair. The woman was about 5 feet 5 inches, 130 or 140 pounds, had blond hair and was in her middle to late twenties. The woman asked Ms. Forestier if the store sold distilled water. Ms. Forestier replied that it did not and directed the couple to a grocery store. Then, upon inspecting several types of piping on the wall, the man asked if that was all the pipe the store had. Ms. Forestier applied affirmatively and the couple exited the store. On cross-examination, Ms. Forestier was unable to positively identify anyone as the woman in the store that day when she was shown a series of photographs by the police, and she was unable to identify the defendant in court on the day of the trial.

Donna Jordan, who used to be employed at the Convenience Food Mart in Bourbonnais, worked the period from August 29 through September 1, 1987. She testified that on one of those nights the defendant, a regular customer, had come into the store with a man who asked for bottled water. On cross-examination, however, Ms. Jordan stated that she was not sure that the defendant was in the store the same night the man came in to buy the water.

Lonnie Martens, a salesman at an electric supply store, testified that Edwards came into the store at around 3 p.m. on September 1, 1987. Edwards was driving a white van and pulled up to the store in front of the windows. Mr. Martens, who had known Edwards for approximately 20 years, noticed that a woman with "fluffed-up" blond hair was waiting in the van. Mr. Martens asked Edwards who the woman was and Edwards replied "Nancy."

Mr. Martens further testified that Edwards purchased a certain brand of tie-wraps which can only be cut off once they are assembled and bundled around wires. Mr. Martens identified the tie-wraps recovered from the defendant's and Edwards' garbage as being the same type purchased by Edwards.

The defendant presented the following evidence at trial.

A bartender testified that at 7 p.m. on August 30, 1987, Edwards came into her bar with a tall man with long, shoulder-length blond hair. The two men left at 10 p.m., returned at 10:30 p.m. and departed again at midnight.

A Bourbonnais police officer testified that at 12:02 p.m. on September 5, 1987, he was advised by a dispatcher that a black pickup truck, with Illinois license plate number 5462AF, was parked in front

of the defendant's residence. No intruders were found inside the residence and the garage was unlocked. The license plate was registered to Tracy Storm. Storm later rode up on a bike and attempted to unlock the truck. He told the police officer that he had been inside the residence earlier that day and that he had removed a motorcycle from the garage.

Michael Roberts, a resident of 754 E. Stratford Drive, testified that in late August or early September of 1987, he observed a "multipainted, kind of primered" pickup truck near the defendant's residence. The man in the truck, who was 6 feet 1 inch or 6 feet 2 inches tall, had shaggy, curly, blond, shoulder-length hair. Mr. Roberts saw him enter the defendant's residence. On cross-examination, Mr. Roberts conceded that he made this observance in mid-August 1987.

The business manager for Paschen Construction, the employer of Tracy Storm and Jefferey Autman, presented time records demonstrating that Tracy Storm had not worked at all on August 31, 1987, but had worked eight hours on September 2 and 3, 1987. Jeffrey Autman worked hours from August 31 through September 3, 1987.

A number of the defendant's friends and relatives testified on her behalf. This evidence tended to establish that during the summer of 1987, the defendant had expressed confusion and unhappiness in regard to her relationship with Edwards. Those witnesses who saw and/or spoke with the defendant in late August and early September 1987 testified that the defendant seemed normal.

Bourbonnais police officer John Griffith testified that on May 1, 1987, he was dispatched to the defendant's residence. The defendant and Edwards were engaged in a verbal altercation.

Anita Hamilton, the defendant's cousin and hairdresser, testified that in August and September 1987, the defendant's hair was a very light blond, as well as soft and full. She described it as a common style and color. Ms. Hamilton also stated that the defendant had a trim and color on September 1, 1987, at 5 p.m. and that she was calm and friendly.

Thad Wells, a tractor driver for J & B Fruit and Vegetable Farm, testified that during the last week of August or the first week of September 1987, he encountered a white van near Cable Line Road, the area in which Small's body was recovered. Inside the van were two white males and a black male. The driver had shoulder-length, dark brown or black hair. Mr. Wells could not get a good look at the white passenger, but he seemed to be heavyset and possibly have blond hair. Mr. Wells indicated that the men looked frightened. Mr. Wells saw the van again, along with a dark blue or black car, at about 4 p.m. that

same day. The van, containing two white males, was heading in the direction of where Small's body was recovered.

An employee of the Phillips 66 gas station in Aroma Park who was working at approximately 5 p.m. on September 2, 1987, testified that he saw two black males drive up to the phone booth in a gray Ford Granada. He also saw a shadow in the backseat.

The attorney who represented the defendant during all police questioning sessions testified that when the defendant was brought in to the police station on September 4, 1987, she was upset, crying and confused as to dates and times. This was her demeanor during all of her sessions except for the last one. The attorney had no information that the defendant had been deprived of food, sleep or water.

The defendant testified in her own behalf. She stated that on August 30, 1987, she and Edwards travelled to the State park on his motorcycle. They ran into Tracy Storm, and Storm and Edwards had a conversation. Storm came over to the defendant's residence later that same afternoon, and the two men spoke again. Edwards and Storm left in Storm's car. About 10 minutes after the two men left, she received a strange call from a male caller asking about Edwards. The defendant testified that she did not leave the house until after 6 p.m. and spoke on the telephone to several people. Edwards returned to the residence at approximately 1 a.m. on August 31, 1987.

On August 31, 1987, the defendant testified that she awoke at approximately 7:30 a.m and got her son off to school. Edwards left the house in his van at approximately 9:30 a.m. She did not know where Edwards went. Edwards returned at 12 noon and the defendant left at 1:30 p.m. to go to her friend Julie Enright's house for the afternoon. She returned home at approximately 4:30 p.m. It was at that time that she noticed that the wooden box was missing from her residence. Edwards arrived home at approximately 5 p.m. and was in and out throughout the evening. The defendant testified that she was not aware of what he was doing.

On September 1, 1987, Edwards left the residence in his van at approximately 10 to 10:30 a.m. Edwards returned home around noon, and, following a conversation with Edwards, the defendant rescheduled a hair appointment until later in the day. She then left the residence with Edwards, and, with Edwards driving, they drove out of town to some railroad tracks that he wanted the defendant to note. When they arrived home, the defendant's son had not yet arrived home from school. During the course of the afternoon, the defendant accompanied Edwards to the electric supply store. The defendant testified that this was not uncommon. The defendant testified that she

waited in the van while Edwards went inside. She testified that she did not know what he purchased.

At approximately 5 p.m., the defendant dropped off her son at football practice and went to get her hair done. This took about an hour and a half. From there she went home, had a light supper and helped her son with his homework.

The defendant testified that she spoke with several friends during the evening. At about 8 p.m., Edwards left in his van and was not gone long. Rish did not know where he went. When he returned home he was tense and nervous. Edwards was in and out quite a bit. After talking with Edwards, they both left in their own vehicles at about 11:45 p.m. The defendant followed Edwards to Mike Spaulding's house. The defendant was aware that at one time Spaulding had set Edwards up on a drug bust. Edwards placed a bag in the trunk of the defendant's vehicle and, following a conversation, the defendant drove with Edwards to a Phillips 66 station. She parked about six feet from the phone booth, waited in the car and did not shut off the engine while Edwards placed a call. The defendant testified that she did not know who he was calling nor did she hear any part of the conversation. Edwards returned to the vehicle, told the defendant to drive to Cobb Park and to hurry up. Once at Cobb Park, Edwards exited the vehicle, went to the trunk, and then told Nancy to go straight home and get out of the area. The defendant returned home and watched a rented video until 2:30 a.m. At that time she left in her car, pursuant to Edwards' request, and picked him up at the earlier noted railroad tracks. Edwards got in the car and told the defendant to return to where his vehicle was parked in front of Spaulding's. They then returned home. Once home the defendant noticed Edwards appeared nervous, jumpy and, at times, panicky. Shortly thereafter, about 3:30 a.m., Edwards again left in his van and was gone about 20 minutes. The defendant went to bed and when Edwards returned, he stayed downstairs the rest of the night.

At 7:30 that morning, the defendant got her son off to school and called the dog groomer's to get an appointment to get her dog groomed. After dropping the dog off, the defendant and Edwards, with Edwards driving the defendant's vehicle, drove to 300 Southeast and took a road that stopped in front of a ranch. This was near where Small's body would eventually be recovered. Edwards told the defendant to pick him up in an hour. The defendant drove to her sister's house and stayed there for 45 to 50 minutes. The defendant then left to pick up Edwards, and at approximately 4:30 p.m. they picked up the dog at the groomer's. On the way home, Edwards stopped the car

at a drive-up phone near a Phillips 66 station in Aroma Park. Although this was a drive-up phone, Edwards parked away from the phone and walked up to it. Edwards' back was turned toward the defendant, and she did not hear anything that was said nor did she see any tape recorder while he was making the call. He was not on the phone long, and when the call was completed, they returned home. Edwards was in and out of the house and appeared preoccupied, tense and very nervous.

Between 10:30 and 11 p.m., Edwards put the defendant's bicycle in the trunk of her car and, with the defendant driving, they drove out to Aroma Park. At Edwards' direction, the defendant pulled up to the curb across from a grocery store and Edwards got out of the car to make yet another call. Once again his back was to the defendant, the car was running and she did not hear the conversation. This call occurred at approximately 11:30 p.m. and did not last very long. Edwards then directed the defendant to drive to Sandbar Road, where he took a duffle bag from the rear seat and placed it in some evergreens. They then drove to another pay phone near a Marathon station, and the defendant parked about 10 to 15 feet away, left the car running and again did not hear any portion of the conversation. After this call, Danny's demeanor was panicky and mad at the same time. Edwards said, "Something is wrong. Something is not right." At some point during this phone call, the defendant saw the tape recorder and recognized it as belonging to Edwards' son. The defendant became bewildered, confused and scared. Edwards then drove back into Aroma Park and past the phone booth across from the super market. Edwards told the defendant that he saw a car there and that he did not like the looks of it and drove away. The defendant testified that Edwards was very nervous.

At about 1 or 2 a.m. on September 3, 1987, they arrived back home. Edwards removed the bicycle from the car and placed it in the garage. He then left again alone in the van and told the defendant he was going out for cigarettes. He was gone 20 to 30 minutes. When he returned he seemed somewhat relieved. After some conversation, the defendant went upstairs to bed and Edwards stayed downstairs.

At about 7:30 a.m. that morning, the defendant left to drop her son off at school and Edwards left in his van. When the defendant returned at 8:30 a.m., Edwards was not there but returned a short time later with the duffle bag he had the previous evening. Edwards told her what was in the bag and what he wanted the defendant to do with it. None of it made any sense to the defendant, and she at no time had any idea of the significance of the bag or its contents. The

defendant spent most of the morning lying on the couch. Edwards was outside most of the day washing the car and taking the garbage out. At about 4:30 to 4:45 p.m., the defendant dropped her son off at his football practice, and she and Edwards proceeded to an Econo Drug for some lozenges for her sister. They proceeded to her sister's house for 10 minutes. They then returned home, and the defendant prepared dinner. Edwards was not eating or sleeping this week and after a bite he went upstairs to lie down. Later in the evening, the defendant drove to the store to get some ice cream for her and her son. When she returned she and her son had ice cream and watched T.V. After several phone calls, she went to bed.

On September 4, 1987, she woke up between 7 and 7:30 a.m. and sent her son off to school. She then returned to bed and re-awoke at 10:30 a.m. with a man in army fatigues pointing a pistol at her face. It was at this time that the search warrant was executed and the defendant was taken into custody.

The defendant also described various domestic disputes that she and Edwards had recently had. When asked by her attorney why she had lied to the police in several of her statements, she responded that it was because she realized that Edwards had used her and was putting her in the middle of this whole thing without her knowledge. She stated that she was "scared to tell the truth."

During the State's case in rebuttal, the State put on two forensic scientists who testified that there was no physical evidence linking Tracy Storm to the victim or the crime scene. In an attempt to discredit the testimony of Thad Wells, the State introduced a Kankakee police officer who testified that there is no seat for a third person in Edwards' van.

After deliberation, the jury found the defendant guilty of first degree murder and aggravated kidnapping. She was sentenced to a prison term of natural life for the murder and 30 years for aggravated kidnapping. The defendant appeals her convictions and sentences, raising several issues on review.

The defendant's first contention is that she was not proven guilty of the offenses beyond a reasonable doubt.

■■ A person is accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).

The defendant asserts that the evidence did nothing more than show that she was sometimes present while Edwards planned and

carried out the kidnapping of Small. Accordingly, the defendant maintains that the State failed to prove the requisite intent in order for her to be held legally accountable for Edwards' crimes.

When a reviewing court is confronted with a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.

We have set out the evidence presented by both sides in great detail. Our review of this evidence reveals that there was testimony given that the defendant was seen in the victim's neighborhood at various times before the crime and that the defendant was seen in the victim's neighborhood on the day of the crime. We note that the defendant failed to deny or explain these occurrences. The box used in the crime was built in the defendant's garage. The defendant admitted accompanying Edwards to procure materials in preparation for the crime. There also exists testimony that the defendant actively assisted in procuring some items for the crime. The defendant admitted taking Edwards to the victim's neighborhood during the night of the crime and picking him up at 3 a.m. later that morning at a prearranged, rural location. She admitted driving him to various phone booths and knew that he used a tape recorder during one of those phone conversations. Along the route described by the defendant as being taken late September 2—early September 3, 1987, physical evidence linking Edwards to the crime was recovered. It appears, then, that as the defendant drove, Edwards was destroying evidence of the crime.

Perhaps the most telling evidence of all was the inconsistent statements given to the police after the defendant's arrest. The defendant's various versions about what she knew/didn't know and what she and Edwards did during the early days of September 1987 damage her credibility, and the jury properly could have concluded that her after-the-fact behavior amounted to an attempt to conceal the truth.

It is our opinion, pursuant to the supreme court's directive in *Young*, that a rational trier of fact could have concluded beyond·a reasonable doubt that the defendant aided Edwards in the commission of this crime.

The defendant next contends that the the trial court erred in

refusing to grant the defendant's motion to quash her arrest. The defendant argues that the search warrant was nothing but a "sham"—that the real purpose in entering the townhouse occupied by the defendant and Edwards was to arrest whoever was present. In support of this allegation, the defendant points to the testimony of two police officers and the fact that the search revealed only a few items described in the search warrant.

The State responds that there is testimony that demonstrates the purpose in going to the townhouse was to search it and interview any persons located at the townhouse. The State argues that some items linking someone living at the townhome to the crime were recovered during the search.

■ We reject the defendant's argument that the search warrant was a "sham" and we note that evidence tending to link at least someone residing at the townhouse was recovered during the search, including a pair of man's boots found in the utility room behind the washer and dryer, a putty knife with traces of a clear, glue-like substance, automobile keys, a notebook, and a Kankakee phone directory with the Small's name circled.

■ As to the defendant's arrest, the officers were in possession of a valid search warrant. Once lawfully inside the defendant's residence, the police had probable cause to believe that the defendant had kidnapped or aided in kidnapping Stephen Small and acted lawfully in placing her under arrest. (*People v. Kite* (1981), 97 Ill. App. 3d 817, 423 N.E.2d 524.) We are unpersuaded by the defendant's attempt to distinguish this case from *Kite* and, accordingly, we affirm the trial court's denial of the defendant's motion to quash.

The defendant next contends that the cause should be reversed and remanded for a new trial based on two instances of prosecutorial misconduct.

Initially, the State asserts that the defendant has waived this issue. The State argues that the defense counsel's failure to make a timely objection to one aspect of the prosecutor's closing rebuttal argument waived the defendant's right to appeal that aspect of the alleged misconduct. The State next argues that defense counsel's failure to allege as error another remark made by the prosecutor during closing rebuttal waived the defendant's right to appeal that aspect of the alleged misconduct.

■ It is well established that it is necessary to both object, as well as raise the issue in a post-trial motion, in order to preserve it for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) Our examination of the record reveals that the State is

correct in its assertion that the defendant failed to preserve this issue for review. However, we have reviewed the arguments propounded by the defendant in regard to both of these alleged acts of misconduct and find them to be without merit.

The defendant next contends that the the trial court improperly refused to hold an evidentiary hearing to challenge the validity of a search warrant affidavit. The defendant, citing *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, claims that she was entitled to a hearing to challenge the veracity of a sworn statement made by Officer Willis in order to search her residence.

■■ The trial judge was correct in denying an evidentiary hearing, as *Franks* requires that an offer of proof be made. The defendant here did not file affidavits or other offers of proof. The defendant simply asked the court to take judicial notice of the evidence heard at the motion to quash arrest. Accordingly, the preliminary stage had not been reached and the court properly refused such an evidentiary hearing.

The defendant also contends that the trial court abused its discretion in sentencing the defendant to a sentence of natural life imprisonment for the murder of Stephen Small.

■■ A trial court's decision in regard to sentencing a defendant is entitled to great deference and weight. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344, 348.) Only if the trial court abused its discretion may its sentencing decision be reversed. *La Pointe*, 88 Ill. 2d at 492, 431 N.E.2d at 348.

■■ In the instant case, the record reveals that the trial court considered the possibility of the defendant's rehabilitation and weighed it against the factors of deterrence and retribution and decided that emphasis on the former would deprecate the seriousness of the crime. This was clearly within its discretion. The sentence is affirmed.

■■ Lastly, the defendant contends that her conviction for aggravated kidnapping must be vacated where it was the predicate offense for the felony murder charge. The defendant concedes that *People v. Tanner* (1986), 142 Ill. App. 3d 165, 491 N.E.2d 776, stands for the proposition that in a case where a general verdict is returned, the rule against multiple convictions for a single act may not apply, since such a verdict is presumed to be based on any good charge to which proof is offered.

The defendant attempts to distinguish the instant case from *Tanner*, contending that here the evidence that the defendant committed either intentional murder (count I) or knowingly created a strong probability of death or great bodily harm (count II) was very weak.

The defendant points to the water, food, light and ventilation provided to Small in the box as indicators that the plan was for him to survive the ordeal. The defendant also contends that it is unreasonable to assume that since Small died, the kidnappers knew that there was a great probability of death or great bodily harm.

We reject the defendant's attempt to distinguish this case from *Tanner*. It does not necessarily follow that the aggravated kidnapping conviction formed the predicate offense for the first degree murder conviction. Accordingly, the defendant's conviction for aggravated kidnapping is affirmed.

For the reasons listed above, the judgment and sentences of the circuit court of Kankakee County are affirmed.

Affirmed.

BARRY and McCUSKEY, JJ., concur.