**Nancy RISH, Plaintiff,**

v.

**Sheryl THOMPSON,[1] Defendant.**

**No. 11–cv–3075.**

United States District Court,
C.D. Illinois,
Springfield Division.

July 24, 2013.

*Demis v. Sniezek,* 558 F.3d 508, 513 n. 2 (6th Cir.2009) (courts can take judicial notice of this publicly available information). The Court substitutes Thompson—the warden of Logan—as the Respondent in this action. *See* Fed.R.Civ.P. 25(d).

Michael J. Costello, Costello Law Office, Springfield, IL, for Petitioner.

Erin M. O'Connell, Asst. Atty. Gen., Office of Ill. Atty. Gen., Chicago, IL, for Respondent.

## *OPINION*

RICHARD MILLS, District Judge:

Petitioner Nancy Rish's Petition for Writ of Habeas Corpus [d/e 1] is denied. But first, the facts.

### I.

### A.

■ In 1987, Petitioner was involved in a kidnapping in Kankakee, Illinois, that resulted in the death of the victim. The following facts are excerpted from the opinion of the Appellate Court of Illinois, Third District: [2]

> On September 2, 1987, Stephen B. Small, a wealthy resident of Kankakee, Illinois, was the victim of a kidnapping-for-ransom scheme. A ransom demand was made to the Small residence. Small's wife contacted Small's sister who then contacted the police. Shortly thereafter, state and federal law enforcement authorities began investigating the crime. Suspicion soon focused on two individuals, Danny Edwards and

---

**2.** The Court is allowed to presume that the facts are accurate. *See Badelle v. Correll,* 452 F.3d 648, 659 (7th Cir.2006) ("On habeas review, we presume that the factual findings of the state appellate court are correct in the absence of clear and convincing evidence to the contrary."); 28 U.S.C. § 2254(e)(1).

Nancy Rish. Edwards and Rish lived together in a townhouse in Bourbonnais. On September 3, 1987, the police obtained a search warrant to search the townhouse. At approximately 10:30 a.m. on September 4, 1987, the police executed the search warrant, during the course of which the defendant and Edwards were taken into custody. During the evening of September 4, 1987, Edwards took the police to a rural area where police officers recovered Small's body.

Small had been bound, placed in a wooden box and buried alive. In addition to Small's body, the box contained a light connected to one of two automobile batteries, a one gallon jug of water, candy bars, gum, a flashlight and PVC piping which came up out of one end of the box. Attached to each of Small's wrists was a single handcuff. There were also superficial abrasions on his legs. The cause of death was determined to be "asphyxia due to suffocation."

On October 1, 1987, the defendant was charged with three counts of first degree murder and several counts of aggravated kidnapping alleging in various forms the kidnapping and murder of Small. The defendant successfully moved to separate her trial from Edwards' trial and for a change of venue. Various other pre-trial motions, including a motion to quash the arrest, a motion to quash the search warrant, a motion to suppress the defendant's custodial statements and several motions in limine were also made by the defendant. Following various hearings on the motions, they were all denied.

A jury was selected in Rockford on October 19 and 20, 1988. The trial began on October 24, 1988, in Kankakee County. During opening statements, the prosecutor indicated that the State's case was one of accountability; that the defendant promoted, aided and facilitated Edwards in the kidnapping and eventual murder of Small. Defense counsel argued that the defendant was not aware of what Edwards was doing and that the physical evidence did not tie the defendant to the victim or the crime scene.

Evidence at trial established that at approximately 12:30 a.m. on September 2, 1987, Ramsey Small, the fifteen year old son of the victim, answered the phone at his parent's residence. A deep voice that he did not recognize identified the caller as being with the Kankakee Police Department. The caller indicated that there had been a break-in at the Bradley House, a Frank Lloyd Wright-designed house Stephen Small owned and was restoring. The caller asked to speak to Stephen Small and, after awakening his father, Ramsey returned to his room. Shortly thereafter, Ramsey saw his father walk past his room and then heard the garage door open and close.

The phone rang again at approximately 3:30 a.m. Ramsey picked up the phone which had moments before been answered by his mother, Nancy Small. Ramsey testified that the voice he heard was different from the 12:30 caller's voice. Ramsey heard the caller say that Stephen Small was being held for ransom of one million dollars and that the family was not to contact the F.B.I. or the police. Mrs. Small then heard her husband's voice. Stephen Small indicated that this was not a joke, that he was in what appeared to be a box that was covered with a lot of sand and that there would be enough air for twenty-four or forty-eight hours. Mrs. Small contacted Stephen Small's sister, Sue Bergeron, and told her what had occurred. Mrs. Bergeron then contacted the F.B.I. and police, who began to investigate the crime.

F.B.I. Special Agent Oren L. Lucas testified that he had a trap and trace

placed on the Small telephone on September 2, 1987. A trap and trace allows the police to determine the location of the caller. At approximately 5:05 p.m. on September 2, 1987, a call was made to the Small residence. The caller inquired how much money Mrs. Small had obtained. Mrs. Small was not allowed to speak to her husband and was told that she would receive a call later in the evening. This call was traced to the Tri–Points Phillips 66 gas station in Aroma Park. Surveillance of the Aroma Park area was established.

Terry Dutour, a resident of Aroma Park who has known Danny Edwards for a number of years, testified that while driving home around 5:00 p.m. on September 2, 1987, he observed Edwards at a pay phone near the Phillips 66 station. There was a vehicle parked near the telephone with a white female with blond hair sitting in it. The vehicle was parked six to eight feet away from the phone booth and Edwards had his back to the vehicle as he spoke.

At approximately 11:30 p.m. that same evening, another call was made to the Small residence. This time the caller played a tape recording of Stephen Small's voice, giving instructions on where to drop off the ransom money. The caller then asked Mrs. Small if she had understood the directions and became impatient with her when she asked for clarification. The call was terminated. At approximately 11:38 p.m., there was another call made to the Small residence. The same person who had called a few minutes earlier had advised Mrs. Small that she had "fucked up" and accused her of having called the police.

During the evening hours of September 2, 1987, F.B.I. Special Agent Michael Evans and his partner were maintaining surveillance of two of the three public pay phones in the Aroma Park area. At approximately 11:30 p.m. they received a radio message from the police dispatch that advised that a call currently being made to the Small residence was coming from a pay phone in the Aroma Park area. The call was not being made from either of the phones under surveillance, so Evans and his partner went to the third phone, arriving there approximately thirty seconds after receiving the radio dispatch. Evans observed a white male wearing a red and white jacket using the phone. Evans also observed a dark colored car, with Illinois license plate number SZG 507, parked approximately fifteen feet from the telephone. A white female with light blond hair was sitting in the driver's seat. The agents watched as the male entered the car, then they followed the car as it proceeded out of town. A search of the motor vehicle records revealed that the car was registered to the defendant.

Agent Lucas testified that on September 2, 1987, at approximately 11:50 p.m., he and Special Agent Dave Buhrmester of the Illinois State Police/Division of Criminal Investigation observed a dark blue automobile, Illinois license plate number SZG 507, heading south toward the village of Aroma Park. The trunk of the automobile was ajar.

F.B.I. Special Agent Elizabeth Lamanna testified that at approximately 12:30 a.m. on September 3, 1987, she and her partner were exiting the parking lot of the Convenient Food Mart in Aroma Park when she observed a blue Buick drive past. The passenger was a white female, in her early twenties, with blond hair. The woman, who turned and looked at Agent Lamanna had a look of "fright or panic" on her face. When the car had passed by, the blond woman turned completely around and looked out the back window. Agent La-

manna later identified this woman as being the defendant.

Special Agent John Russell of the Illinois State Police/Division of Criminal Investigation, testified that during the early morning hours of September 3, 1987, he was requested to drive by the residence located at 756 East Stratford Drive in Bourbonnais, Illinois and look for a vehicle with Illinois license plate SZG 507. Agent Russell and his partner did not observe that vehicle, but did see a white van parked across the street from the residence. Agent Russell identified Edwards' van as being the van that was located across from the residence that evening.

Surveillance was established in the parking lot of an apartment complex located approximately 50 to 75 yards away from the residence. At approximately 1:19 a.m., Agent Russell observed a vehicle with Illinois license plate SZG 507 parked in the driveway of the residence. Agent Russell identified the defendant's car as being the same car he saw in the driveway.

According to Agent Russell, there were two occupants in the car, a white male later identified as Danny Edwards and a white female later identified as the defendant. Agent Russell positively identified the defendant as the woman he had seen in the car that morning.

Agent Russell further testified that Edwards removed a bicycle from the trunk of the car. At approximately 1:40 a.m. that same morning, Edwards exited the residence and drove off in the white van. An F.B.I. Agent followed Edwards who went to a grocery store and a gas station. Edwards made a phone call at a public pay phone at the gas station before returning to the residence.

Edwards and the defendant were kept under surveillance from that point forward. During the morning of September 3, 1987, garbage was being picked up in the defendant's neighborhood. The police made contact with the garbage truck driver and asked him to empty his hopper prior to going into the defendant's neighborhood and then meet them at a pre-arranged location. The garbage truck driver complied. While stopped at the defendant's house, Edwards came out and gave the garbageman a trashbag. The garbageman threw this bag, as well as three bags already on the curb, into the hopper. Several items were discovered after the police examined the hopper, including a paper bag containing gloves, a receipt to Danny Edwards from Radio Shack for one audiotape cassette and some electrical straps, which are of the type also used by police as handcuffs. Also observed but not recovered was a caulking gun and a saw.

A search warrant for the townhouse was obtained later in the day. The search warrant was executed at approximately 10:30 a.m. on September 4, 1987. Both Edwards and the defendant were taken into custody. Recovered from the residence were a pair of man's boots found in the utility room behind the washer and dryer, a 1986 Kankakee phone directory with the Small's name circled at the top of page 20, a putty knife with traces of a clear glue-like substance, a notebook and automobile keys.

The defendant was transported to the Bourbonnais Police Station. During the days of September 4 to September 8, 1987, the defendant gave the following eight statements to police:

1. September 4, 1987, 11:00 a.m. The defendant denied knowing anything about a ransom call made from Aroma Park during the night of September 2, 1987. The defendant indicated that at about 11:00 p.m. on September 2, 1987, she and Edwards went to Edwards'

friend Jack's house in her car to get her bicycle repaired. En route to Jack's house, they stopped at a phone booth located near a gas station in Aroma Park where Edwards got out and called Jack to see if he was home. At this point, the defendant was advised of her Miranda rights. The defendant waived her rights and continued with her statement.

The defendant indicated that after Edwards called Jack, they drove past Jack's house. Because there were no lights on, they continued on. The defendant stated that Edwards told her that Jack was not home because he was working a second shift.

As to the events of September 1, 1987, the day preceding the kidnapping, the defendant indicated that she was home until 5:00 p.m. At that time she took her son to football practice, picked him up at 7:00 p.m., and helped him with his homework until 10:30 p.m. She did not know if Edwards had gone anywhere that evening because she slept upstairs and he slept downstairs on the couch. The defendant indicated that she wanted to terminate the interview and consult with an attorney.

2. September 4, 1987, 2:30 p.m. Questioning resumed when the defendant's counsel appeared. During this statement, the defendant indicated that on Sunday evening (August 30, 1987) at approximately 6:30 p.m. she had a call from someone who asked for Danny. When she asked the caller's identity, he stated "What's it to you?" and hung up. That same type of call occurred again on September 1, 1987.

At 10:30 p.m. on September 1, 1987, the defendant indicated that Edwards left the duplex in his van. She went out to look for him at 11:30 p.m. because she thought he was cheating on her. She returned without finding him at approximately 12:00 a.m. on September 2, 1987.

She indicated that she again left the residence at between 1:30 and 2:00 a.m. to again look for him. Edwards was at the residence when she returned.

During the afternoon of September 2, 1987, she took her dog to get clipped. The defendant substantially repeated her account of taking the bike to Jack's house, adding that after they passed Jack's house, they drove to the Marathon gas station in Kankakee where Edwards made a phone call. According to the defendant, it took approximately one-half hour for them to travel from the gas station in Aroma Park to the gas station in Kankakee. She further indicated that on the morning of September 3, 1987, Edwards left the residence for breakfast.

The police asked the defendant to take them on the same route that she and Edwards had travelled on September 2, 1987. The route the defendant took to the phone booth in Aroma Park was the same route she had described in her statement. The route that she took from that pay phone to the one at the Marathon gas station in Kankakee was a different route from the one described in her statement.

A ground search of a rural area just north of Aroma Park, along the route the defendant showed police after her second statement, yielded several items. These items consisted of several feet of cassette tape, several small pieces of cassette tape, one side of a Radio Shack brand cassette tape housing, the other side of a cassette tape housing and a bag containing pieces of tape and one cassette tape.

3. September 4, 1987, 7:00 p.m. After returning to the police station, the police asked her to give another statement. The defendant added that when she went to look for Edwards the second

time, during the early hours of September 2, 1987, she looked in the Aroma Park area.

4. September 6, 1987, 12:00 p.m. After the defendant was advised that Small's body had been recovered, police asked her if she knew anything about a box. The defendant indicated that Edwards had built a large wooden box in the garage of their residence. The defendant indicated that Edwards had given her two reasons for building the box. The first was that he was going to give it to his brother. The second was that it was to be used to store firewood. The defendant also told the police that in May or June, 1987 Edwards sold the box to a heavy-set black man who had purchased their dryer.

The defendant further indicated that after she and Edwards picked up the dog from the dog groomer's, Edwards directed her to the Tri–Points Phillips 66 gas station in Aroma Park where he made a phone call at approximately 5:00 p.m.

5. September 7, 1987, 11:00 a.m. The defendant stated that after she and Edwards dropped the dog off at the dog groomer's at 2:00 p.m. on September 2, 1987, Edwards asked her if she wanted to see some horses. They then drove to a place where some black people own a rodeo.

The defendant denied knowing anything about a tape recorder being used in any of the calls made by Edwards. The defendant started to cry and dropped her head into her hands when she was told that her fingerprints were on a tape recorder they had found. The defendant indicated that she had lied to the police about the tape recorder; that Edwards' son had left it in their duplex and that she had moved it either upstairs or downstairs.

The defendant further testified that there was an old car battery in the duplex and that Edwards had purchased another one from a junkyard on Route 113 on August 31, 1990.

The police concluded the interrogation by telling the defendant that her son had indicated that he had seen the box in the garage of their duplex on August 30, 1987, and questioned the defendant as to whether she was calling her son a liar.

6. September 7, 1987, 8:30 p.m. The defendant admitted that the box had not been sold to a black man and that the last time she saw it was on August 31, 1987.

The defendant indicated that during the afternoon of September 1, 1987, Edwards took her to a location where he wanted her to pick him up at 3:00 a.m. the next morning.

Late on September 1, 1987, or early September 2, 1987, Edwards had her follow him to Greenwood Avenue. He then got into her car and had her drive him to Cobb Park. Cobb Park is located one block away from the Small residence. She went home and picked him up from the above mentioned location at 3:00 a.m. She drove him back to his van, parked on Greenwood Avenue, and returned home. Edwards was already there when she arrived.

The defendant indicated that she never got out of the car on September 2, 1987, to look at horses, rather she just dropped off Edwards and picked him up about one hour later. Police were aware that this was the rural area where Small's body was eventually recovered.

The defendant reported that she saw the tape recorder in the car on the night of September 2, 1987 and that Edwards took it with him when he went to make his 11:30 p.m. phone call. The defendant told the police where this tape re-

corder was discarded, but when the area was searched, it was not recovered.

Between the 11:30 p.m. phone call and the 11:50 p.m. phone call, they stopped along Pottinger Road where Edwards hid a duffle bag in some evergreens. She admitted that instead of going to breakfast on September 3, 1987, Edwards went out and picked up the duffle bag.

The defendant further indicated that on August 30, 1987, she and Edwards got into an argument when he returned late to their residence. Edwards ran upstairs, got a gun, pointed it at his head and indicated that he was going to kill the defendant, the defendant's son, and himself.

7. September 8, 1987, 9:30 a.m. The defendant added that during the early hours of September 2, 1987, after she followed Edwards to Greenwood Avenue and picked him up, she drove him to the Phillips 66 gas station in Kankakee where he made a phone call about 12:30 a.m.

The defendant also admitted that there was a pair of bolt cutters at her duplex.

8. September 8, 1987, evening. The defendant indicated that there wasn't a pair of bolt cutters at her duplex.

The defendant stated that Edwards pointed the gun at her head, not his head, during the argument on August 30, 1987.

The State produced substantial forensic evidence which linked Edwards to the crime. Edwards' fingerprints were found on both PVC piping and duct tape recovered from the burial box. Sand scraped from a pair of boots found behind a washer and dryer at the defendant's and Edwards' residence, as well as sand recovered from the interior of Edwards' van, matched a sand sample taken from the burial site. White caulk-ing material found on gloves recovered from Edwards' and Rish's trash had the same chemical composition as the sample of white caulking material taken from the burial box. Cross-examination of various State witnesses revealed that there was no physical evidence which linked the defendant to either the victim or the crime scene.

The State presented witnesses that tended to demonstrate that the defendant was aware that the victim was quite wealthy and that the defendant knew where the victim lived, as she had previously resided only blocks away from the Small residence. Additionally, there was testimony that the defendant had lived off the money generated by Edwards' drug dealing and that his arrest in January, 1987 for that offense resulted in things being "tight" financially.

The State also presented evidence that the defendant was seen in the vicinity of the Small residence both prior to the crime and on September 2, 1987.

Karen Thacker, a former neighbor of Stephen Small, testified that approximately eight to ten times during the summer of 1987, she saw a light-colored van with a tire on back, which looked like Edwards' van, drive through the alley which separates her home from the Small residence. One morning in August, 1987 Mrs. Thacker saw the van stopped in the middle of the alley. Facing the front of the van from a distance of approximately five feet, Mrs. Thacker saw a white, blond-haired woman sitting in the passenger seat and a white male in the driver's seat. Mrs. Thacker's attention was focused on the woman who first looked at her, then at the driver and finally back to her. Mrs. Thacker testified that the woman looked "startled." When Mrs. Thacker saw the van on earlier occasions that summer, she

noticed then as well that it was occupied by a man and a blond woman. Mrs. Thacker further testified that the day after she discovered that Stephen Small had been kidnapped and murdered, she informed a law enforcement official of what she had seen. Later, after viewing newspaper photographs and television accounts depicting the defendant, Mrs. Thacker recognized the defendant as being the woman in the van on that August day. Mrs. Thacker positively identified Rish in court as being the woman she had seen in the van.

Caroline Mortell, a friend of the Small family and a resident on the same block as the Smalls, testified that from her den window she is able to see the Small residence. At approximately 11:00 a.m. on September 2, 1987, Mrs. Mortell was looking out her den window when she saw a white van with large vertical windows on the driver's side, proceeding toward her home. The van stopped at the intersection in front of her home and Mrs. Mortell saw that it was occupied by just one person-a woman in her late twenties or early thirties, with blond hair and a dark complexion or make-up. The woman seemed to be "looking around the area." As Mrs. Mortell continued to watch, the van turned left and proceeded toward the Small home. Later that same afternoon, between 1:30 and 3:30 p.m., Mrs. Mortell thought she saw the same van once or twice again in the same area, proceeding toward the Small house. Mrs. Mortell made an in-court identification of a picture of Edwards' van as being the van she saw driving on the street that day.

Mrs. Mortell further testified that some time later, she was asked to view a series of photographs of women who had their faces covered by tape. The purpose of this was to determine whether she could select the hair style of the woman driving the van on September 2,

1987. When shown the same six photographs in court, Mrs. Mortell identified photograph number 4 as the one she had previously selected as depicting the same hair style of the woman driving the van. The photograph was of the defendant.

The State also presented the testimony of several witnesses who had seen the defendant or a woman similar to the physical description of the defendant with Edwards or a man similar to the physical description of Edwards procuring various items in preparation for the crime. These witnesses included Linda Forestier, a clerk at a hardware store in Aroma Park. Ms. Forestier testified that a man and a woman entered the store together on or about August 31, 1987. The man was about 5' 7" or 5' 8", 160 pounds with dark hair. The woman was about 5' 5", 130 or 140 pounds, had blond hair and was in her middle to late twenties. The woman asked Ms. Forestier if the store sold distilled water. Ms. Forestier replied that it did not and directed the couple to a grocery store. Then, upon inspecting several types of piping on the wall, the man asked if that was all the pipe the store had. Ms. Forestier applied affirmatively and the couple exited the store. On cross-examination, Ms. Forestier was unable to positively identify anyone as the woman in the store that day when she was shown a series of photographs by the police, and she was unable to identify the defendant in court on the day of the trial.

Donna Jordan, who used to be employed at the Convenience Food Mart in Bourbonnais, worked the period from August 29 through September 1, 1987. She testified that on one of those nights the defendant, a regular customer, had come into the store with a man who asked for bottled water. On cross-examination, however, Ms. Jordan stated

that she was not sure that the defendant was in the store the same night the man came in to buy the water.

Lonnie Martens, a salesman at an electric supply store, testified that Edwards came into the store at around 3:00 p.m. on September 1, 1987. Edwards was driving a white van and pulled up to the store in front of the windows. Mr. Martens, who had known Edwards for approximately twenty years, noticed that a woman with "fluffed-up" blond hair was waiting in the van. Mr. Martens asked Edwards who the woman was and Edwards replied "Nancy."

Mr. Martens further testified that Edwards purchased a certain brand of tie-wraps which can only be cut off once they are assembled and bundled around wires. Mr. Martens identified the tie-wraps recovered from the defendant's and Edwards' garbage as being the same type purchased by Edwards.

The defendant presented the following evidence at trial.

A bartender testified that at 7:00 p.m. on August 30, 1987, Edwards came into her bar with a tall man with long, shoulder-length blond hair. The two men left at 10:00 p.m., returned at 10:30 p.m. and departed again at midnight.

A Bourbonnais Police Officer testified that at 12:02 p.m. on September 5, 1987, he was advised by a dispatcher that a black pick-up truck, with Illinois license plate number 5462AF, was parked in front of the defendant's residence. No intruders were found inside the residence and the garage was unlocked. The license plate was registered to Tracy Storm. Storm later rode up on a bike and attempted to unlock the truck. He told the police officer that he had been inside the residence earlier that day and that he had removed a motorcycle from the garage.

Michael Roberts, a resident of 754 E. Stratford Drive, testified that in late August or early September of 1987, he observed a "multi-painted, kind of primered" pick-up truck near the defendant's residence. The man in the truck, who was 6′ 1″ or 6′ 2″ tall, had shaggy, curly blond, shoulder length hair. Mr. Roberts saw him enter the defendant's residence. On cross-examination, Mr. Roberts conceded that he made this observance in mid-August, 1987.

The business manager for Paschen Construction, the employer of Tracy Storm and [Jeffrey] Autman, presented time records demonstrating that Tracy Storm had not worked at all on August 31, 1987, but had worked eight hours on September 2 and 3, 1987. Jeffrey Autman worked hours from August 31 through September 3, 1987.

A number of the defendant's friends and relatives testified on her behalf. This evidence tended to establish that during the summer of 1987, the defendant had expressed confusion and unhappiness in regard to her relationship with Edwards. Those witnesses who saw and/or spoke with the defendant in late August and early September, 1987 testified that the defendant seemed normal.

Bourbonnais Police Officer John Griffith testified that on May 1, 1987, he was dispatched to the defendant's residence. The defendant and Edwards were engaged in a verbal altercation.

Anita Hamilton, the defendant's cousin and hairdresser, testified that in August and September, 1987, the defendant's hair was a very light blond, as well as soft and full. She described it as a common style and color. Ms. Hamilton also stated that the defendant had a trim and color on September 1, 1987 at

5:00 p.m. and that she was calm and friendly.

Thad Wells, a tractor driver for J & B Fruit and Vegetable Farm, testified that during the last week of August or the first week of September, 1987, he encountered a white van near Cable Line Road, the area in which Small's body was recovered. Inside the van were two white males and a black male. The driver had shoulder-length, dark brown or black hair. Mr. Wells could not get a good look at the white passenger, but he seemed to be heavy-set and possibly have blond hair. Mr. Wells indicated that the men looked frightened. Mr. Wells saw the van again, along with a dark blue or black car, at about 4:00 p.m. that same day. The van, containing two white males, was heading in the direction of where Small's body was recovered.

An employee of the Phillips 66 gas station in Aroma Park who was working at approximately 5:00 p.m. on September 2, 1987, testified that he saw two black males drive up to the phone booth in a gray Ford Granada. He also saw a shadow in the backseat.

The attorney who represented the defendant during all police questioning sessions, testified that when the defendant was brought in to the police station on September 4, 1987, she was upset, crying and confused as to dates and times. This was her demeanor during all of her sessions except for the last one. The attorney had no information that the defendant had been deprived of food, sleep or water.

The defendant testified in her own behalf. She stated that on August 30, 1987, she and Edwards travelled to the state park on his motorcycle. They ran into Tracy Storm and Storm and Edwards had a conversation. Storm came over to the defendant's residence later that same afternoon and the two men spoke again. Edwards and Storm left in Storm's car. About ten minutes after the two men left, she received a strange call from a male caller asking about Edwards. The defendant testified that she did not leave the house until after 6:00 p.m. and spoke on the telephone to several people. Edwards returned to the residence at approximately 1:00 a.m. on August 31, 1987.

On August 31, 1987, the defendant testified that she awoke at approximately 7:30 a.m. and got her son off to school. Edwards left the house in his van at approximately 9:30 a.m. She did not know where Edwards went. Edwards returned at 12:00 p.m. and the defendant left at 1:30 p.m. to go to her friend Julie Enright's house for the afternoon. She returned home at approximately 4:30 p.m. It was at that time that she noticed that the wooden box was missing from her residence. Edwards arrived home at approximately 5:00 p.m. and was in and out throughout the evening. The defendant testified that she was not aware of what he was doing.

On September 1, 1987, Edwards left the residence in his van at approximately 10:00–10:30 a.m. Edwards returned home around noon, and, following a conversation with Edwards, the defendant rescheduled a hair appointment until later in the day. She then left the residence with Edwards, and, with Edwards driving, they drove out of town to some railroad tracks that he wanted the defendant to note. When they arrived home, the defendant's son had not yet arrived home from school. During the course of the afternoon, the defendant accompanied Edwards to the electric supply store. The defendant testified that this was not uncommon. The defendant testified that she waited in the van while Edwards went inside. She

testified that she did not know what he purchased.

At approximately 5:00 p.m., the defendant dropped off her son at football practice and went to get her hair done. This took about an hour and a half. From there she went home, had a light supper and helped her son with his homework.

The defendant testified that she spoke with several friends during the evening. At about 8:00 p.m., Edwards left in his van and was not gone long. Rish did not know where he went. When he returned home he was tense and nervous. Edwards was in and out quite a bit. After talking with Edwards they both left in their own vehicles at about 11:45 p.m. the defendant followed Edwards to Mike Spaulding's house. The defendant was aware that at one time Spaulding had set Edwards up on a drug bust. Edwards placed a bag in the trunk of the defendant's vehicle and, following a conversation, the defendant drove with Edwards to a Phillips 66 station. She parked about six feet from the phone booth, waited in the car and did not shut off the engine while Edwards placed a call. The defendant testified that she did not know who he was calling nor did she hear any part of the conversation. Edwards returned to the vehicle, told the defendant to drive to Cobb Park and to hurry up. Once at Cobb Park, Edwards exited the vehicle, went to the trunk, and then told Nancy to go straight home and get out of the area. The defendant returned home and watched a rented video until 2:30 a.m. At that time she left in her car, pursuant to Edwards' request, and picked him up at the earlier noted railroad tracks. Edwards got in the car and told the defendant to return to where his vehicle was parked in front of Spaulding's. They then returned home. Once home the defendant noticed Edwards appeared nervous, jumpy and, at times, panicky. Shortly thereafter, about 3:30 a.m., Edwards again left in his van and was gone about twenty minutes. The defendant went to bed and when Edwards returned he stayed downstairs the rest of the night.

At 7:30 that morning, the defendant got her son off to school and called the dog groomer's to get an appointment to get her dog groomed. After dropping the dog off, the defendant and Edwards, with Edwards driving the defendant's vehicle to 300 Southeast and took a road that stopped in front of a ranch. This was near where Small's body would eventually be recovered. Edwards told the defendant to pick him up in an hour. The defendant drove to her sister's house and stayed there for forty-five to fifty minutes. The defendant then left to pick up Edwards and at approximately 4:30 p.m. they picked up the dog at the groomer's. On the way home, Edwards stopped the car at a drive-up phone near a Phillips 66 station in Aroma Park. Although this was a drive-up phone, Edwards parked away from the phone and walked up to it. Edwards' back was turned toward the defendant and she did not hear anything that was said nor did she see any tape recorder while he was making the call. He was not on the phone long and when the call was completed they returned home. Edwards was in and out of the house, and appeared preoccupied, tense and very nervous.

Between 10:30 and 11:00 p.m., Edwards put the defendant's bicycle in the trunk of her car and, with the defendant driving, they drove out to Aroma Park. At Edwards' direction, the defendant pulled up to the curb across from a grocery store and Edwards got out of the car to make yet another call. Once again his back was to the defendant, the

car was running and she did not hear the conversation. This call occurred at approximately 11:30 p.m. and did not last very long. Edwards then directed the defendant to drive to Sandbar Road, where he took a duffle bag from the rear seat and placed it in some evergreens. They then drove to another pay phone near a Marathon station and the defendant parked about ten to fifteen feet away, left the car running and again did not hear any portion of the conversation. After this call, Danny's demeanor was panicky and mad at the same time. Edwards said, "Something is wrong. Something is not right." At some point during this phone call, the defendant saw the tape recorder and recognized it as belonging to Edwards' son. The defendant became bewildered, confused and scared. Edwards then drove back into Aroma Park and past the phone booth across from the super market. Edwards told the defendant that he saw a car there and that he did not like the looks of it and drove away. The defendant testified that Edwards was very nervous.

At about 1:00 or 2:00 a.m. on September 3, 1987, they arrived back home. Edwards removed the bicycle from the car and placed it in the garage. He then left again alone in the van and told the defendant he was going out for cigarettes. He was gone twenty to thirty minutes. When he returned he seemed somewhat relieved. After some conversation the defendant went upstairs to bed and Edwards stayed downstairs.

At about 7:30 a.m. that morning the defendant left to drop her son off at school and Edwards left in his van. When the defendant returned at 8:30 a.m., Edwards was not there but returned a short time later with the duffle bag he had the previous evening. Edwards told her what was in the bag and what he wanted the defendant to do with

it. None of it made any sense to the defendant and she at no time had any idea of the significance of the bag or its contents. The defendant spent most of the morning lying on the couch. Edwards was outside most of the day washing the car and taking the garbage out. At about 4:30 to 4:45 p.m., the defendant dropped her son off at his football practice and she and Edwards proceeded to an Econo Drug for some lozenges for her sister. They proceeded to her sister's house for ten minutes. They then returned home and the defendant prepared dinner. Edwards was not eating or sleeping this week and after a bite he went upstairs to lie down. Later in the evening the defendant drove to the store to get some ice cream for her and her son. When she returned she and her son had ice cream and watched T.V. After several phone calls, she went to bed.

On September 4, 1987, she woke up between 7:00 and 7:30 a.m. and sent her son off to school. She then returned to bed and re-awoke at 10:30 a.m. with a man in Army fatigues pointing a pistol at her face. It was at this time that the search warrant was executed and the defendant was taken into custody.

The defendant also described various domestic disputes that she and Edwards had recently had. When asked by her attorney why she had lied to the police in several of her statements, she responded that it was because she realized that Edwards had used her and was putting her in the middle of this whole thing without her knowledge. She stated that she was "scared to tell the truth."

During the State's case in rebuttal, the State put on two forensic scientists who testified that there was no physical evidence linking Tracy Storm to the victim or the crime scene. In an attempt

to discredit the testimony of Thad Wells, the State introduced a Kankakee Police Officer who testified that there is no seat for a third person in Edwards' van.

After deliberation, the jury found the defendant guilty of first degree murder and aggravated kidnapping. She was sentenced to a prison term of natural life for the murder and thirty years for aggravated kidnapping.

*People v. Rish,* 208 Ill.App.3d 751, 753–67, 153 Ill.Dec. 69, 566 N.E.2d 919 (3d Dist. 1991).

Petitioner sought appellate review, but the Appellate Court of Illinois affirmed the conviction and sentence, *see id.* at 771, 153 Ill.Dec. 69, 566 N.E.2d 919, and the Supreme Court of Illinois denied her petition for leave to appeal, *People v. Rish,* 139 Ill.2d 602, 159 Ill.Dec. 114, 575 N.E.2d 921 (1991) (table).

### B.

Petitioner filed a post-conviction petition in the Circuit Court of Kankakee County on December 31, 1991. Petitioner filed a supplemental petition on May 18, 1994. Throughout the late 1990s the trial court held numerous hearings, including evidentiary hearings, and made some rulings on some of the claims. On November 14, 2000, the Circuit Court denied the remaining claims.

Petitioner appealed, and the decision of the Circuit Court was affirmed in part and reversed in part. *See People v. Rish,* 336 Ill.App.3d 875, 271 Ill.Dec. 335, 784 N.E.2d 889 (3d Dist.2003).

The Supreme Court of Illinois reversed a portion of the Appellate Court's decision via a short order. *See People v. Rish,* 205 Ill.2d 629, 277 Ill.Dec. 688, 796 N.E.2d 1054 (2003) (reversing decision on Rish's *Apprendi* claim). The Appellate Court then entered another opinion, remanding again. *See People v. Rish,* 344 Ill.App.3d 1105, 280 Ill.Dec. 575, 802 N.E.2d 826 (2003).

Additional proceedings were held in the Circuit Court (including an additional evidentiary hearing), and the remaining claims were denied on January 10, 2006. Petitioner appealed again, and the decision of the Circuit Court was affirmed by the Appellate Court on October 16, 2008, in an unpublished disposition. *See* Appellate Court Opinion [d/e 9–17].

Petitioner then unsuccessfully petitioned for leave to appeal to the Illinois Supreme Court. *See People v. Rish,* 231 Ill.2d 682, 328 Ill.Dec. 474, 904 N.E.2d 984 (2009) (table).

Petitioner has at no time sought review in the Supreme Court of the United States.

### II.

Petitioner initiated this action on March 19, 2010. *See* Petition [d/e 1].

The Respondent filed her Answer [d/e 8] and Exhibits [d/e 9] on September 15, 2010, and Petitioner filed the Reply [d/e 12] on January 18, 2011.

After a number of transfers, this case was assigned to the undersigned.[3]

**3.** The case was initially assigned to U.S. District Judge Jeanne E. Scott. However, Judge Scott transferred the case to the Urbana Division of this Court, because the underlying facts and judicial proceedings took place in Kankakee County, which is part of the Urbana Division. Then–Chief Judge Michael P. McCuskey was assigned the case. However, both he and U.S. Magistrate Judge John Gor-

man were recused from the case because they both served on the panel of the Appellate Court of Illinois that affirmed Petitioner's conviction. The case was reassigned to U.S. District Judge Sue E. Myerscough of this Division. Judge Myerscough recused herself from the case, and it is now before the undersigned.

Petitioner raised seventeen claims in the Petition [d/e 1]. The Court notes that Petitioner has been represented by counsel throughout this case, and that the filings were drafted by her attorney. The Respondent argued that most of the claims were procedurally defaulted, and that the remaining claims were without merit.

It the Petitioner's Reply [d/e 12], she withdrew nine of the claims.

The remaining eight claims[4] are as follows:

1. "Petitioner was denied her Fifth, Sixth and Fourteenth Amendment rights to counsel and to the effective assistance of counsel at custodial preindictment interrogation."

2. "Petitioner was denied effective assistance of counsel after formal charge where her court-appointed attorneys made no attempt, by motion to suppress, objection, or otherwise, to preclude the use by the prosecution of Petitioner's custodial statements."

3. "Petitioner was denied due process of law where the trial prosecutor argued to the jury contentions which were known by the prosecution to be false."

4. "Petitioner was denied due process of law where the prosecutor manufactured, and vividly argued to the jury, a highly prejudicial allegation out of pure speculation and conjecture and entirely without evidentiary support."

5. "Petitioner was denied effective assistance of counsel when her trial attorneys failed to object to highly prejudicial conjectural jury argument by the prosecutor."

6. "Petitioner was denied due process of law where the prosecutors argued to the jury a highly incriminating theory which they knew or should have known was based upon speculation and conjecture and was entirely without evidentiary support."

7. "This cause should be reversed and remanded for a new trial because Nancy Rish was denied a fair trial by prosecutorial misconduct."

8. "Evidence relevant to Petitioner's conflict of interest claim and alleged threats to Petitioner by law enforcement agents claim violated the due process rights of the Petitioner."

### III.

The Petitioner has procedurally defaulted a number of these claims.

### A.

Perhaps the Seventh Circuit's best encapsulation of the rules regarding procedural default comes from an unpublished disposition:

Under title 28 U.S.C. § 2254, [federal courts] may not grant a petition for a writ of habeas corpus unless a petitioner has exhausted his state court remedies. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) ("Section 2254(c) requires only that state prisoners give state courts a fair opportunity to act on their claims." (emphasis in original)). In the context of this appeal, exhaustion occurs when the petitioner has fairly presented his claim to the state courts by arguing not only the federal legal principles but also the operative facts of the claim thereby giving the state courts a "meaningful opportunity to pass upon the substance of the claims later presented in federal court."

---

4. The parties have numbered the claims differently, so the Court, too, adopts its own numbering of the claims.

*Chambers v. McCaughtry*, 264 F.3d 732, 737–38 (7th Cir.2001) (quoting *Rodriguez v. Scillia*, 193 F.3d 913, 916 (7th Cir.1999)); *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir.2001). Failure to do so will result in procedural default of the claim, which is excusable upon a showing of cause for the failure and resulting prejudice or a showing that a decision not to review the claim will result in a fundamental miscarriage of justice. *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir.2002), *cert. denied*, 537 U.S. 1214, 123 S.Ct. 1312, 154 L.Ed.2d 1065 (2003).

In *Baldwin* [*v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) ], the Court found that a petitioner failed to fairly present his "appellate ineffective assistance of counsel claim" when he failed to assert that appellate counsel's errors implicated federal law. The Court held that "a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case that does so." 541 U.S. at 32, 124 S.Ct. at 1351. The Court further reasoned that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* *Ambrose v. Holmes*, 112 Fed.Appx. 514, 515–16 (7th Cir.2004).

■ Default can only be excused if a petitioner "can establish cause and prejudice, or establish that the failure to con-

sider the defaulted claim will result in a fundamental miscarriage of justice." *Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir.2010) (citing *Dretke v. Haley*, 541 U.S. 386, 388, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004)).

The Court of Appeals has explained as follows:

> Cause for a default is ordinarily established by showing that some type of "external impediment" prevented the petitioner from presenting his claim. Prejudice is established by showing that the violation of the petitioner's federal rights worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.

*Promotor*, 628 F.3d at 887 (citations and quotation marks omitted).

### B.

■ Claim One [5] is procedurally defaulted because these allegations were not presented at all stages of state review.

Petitioner never raised her Fifth and Sixth Amendment arguments regarding pre-indictment counsel before the Supreme Court of Illinois. These federal claims were last addressed in the Appellate Court of Illinois, Third District, in 2003. *See* 344 Ill.App.3d at 1112–15, 280 Ill.Dec. 575, 802 N.E.2d 826.

The Appellate Court held that the purpose of the Fifth Amendment is to prevent police coercion of suspects, and that her Fifth Amendment rights were not violated because pre-indictment counsel occasionally stopped the interrogation and also directed Petitioner to not answer some questions. *See id.* at 1112–13, 280 Ill.Dec. 575, 802 N.E.2d 826. The Appellate Court also held that the Fifth Amendment does not include the same guarantee of effective

---

**5.** "Petitioner was denied her Fifth, Sixth and Fourteenth Amendment rights to counsel and

to the effective assistance of counsel at custodial preindictment interrogation."

assistance of counsel contained in the Sixth Amendment, although it held that the Illinois Constitution guaranteed that suspects subject to custodial interrogation had a right to conflict-free counsel. *Id.* The Appellate Court remanded the case for further proceedings to determine whether this state right to conflict-free counsel had been violated. *Id.* at 1113–1114, 280 Ill. Dec. 575, 802 N.E.2d 826. The Appellate Court held that the Circuit Court was to use *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) in evaluating the state constitutional claim.

The Appellate Court rejected Petitioner's novel sixth amendment argument—that the right to effective counsel attaches when the prosecutor makes the decision to seek an indictment. *Id.* at 1114–15, 280 Ill.Dec. 575, 802 N.E.2d 826.

Petitioner did not timely seek review of these decisions in the Supreme Court of Illinois, and the Supreme Court of Illinois reversed on other grounds.

The case went back to the Circuit Court on remand, and the Circuit Court ruled in favor of the State. Petitioner was dissatisfied with how the Circuit Court interpreted the Appellate Court's mandate, and appealed, but without any success. These concerns related only to the *state* ineffective assistance of counsel claims.

Petitioner then filed her Petition for Leave to Appeal with the Supreme Court of Illinois. However, she did not seek review of the issues contained in Claim One. Rather she complained that the Circuit Court interpreted the mandate too narrowly and that the Appellate Court improperly affirmed the Circuit Court.

She expressly acknowledged in her P.L.A. that the federal claims had been

rejected in the Appellate Court's penultimate opinion. *See* Petitioner's P.L.A. [d/e 9–17], p. 46–47 [6] ("Having rejected petitioner's ineffective assistance claims under the federal constitution, the appellate court granted hearing on the state constitutional aspects of her claim."). Petitioner's prayer for relief was that the case be remanded again so that the *state* constitutional claims could be examined again under a broad construction of Appellate Court's previous mandate. *Id.* at 19–20.

Petitioner has included an excerpt from the P.L.A. in the Reply [d/e 12], pp. 21–22, discussing the alleged ineffectiveness of pre-indictment counsel to demonstrate that these claims were presented to the Supreme Court. However, in full context, it can be determined that the discussion relates solely to the *state* claims.

Therefore, it is apparent that Petitioner's Fifth and Sixth Amendment claims are procedurally defaulted because she did not present them to the Supreme Court of Illinois.

This Court cannot find an instance where Petitioner presented her Fourteenth Amendment claims to the courts of Illinois. Accordingly, it is procedurally defaulted.

■ Petitioner has not shown cause and prejudice for this default. This procedural default will not result in a fundamental miscarriage of justice.

In the alternative, the Court concludes that these claims would fail on the merits.

### C.

■ Claim Two [7] is procedurally defaulted because it was never presented to the Supreme Court of Illinois.

---

6. Due to the large number of documents filed in this case and the variety of pagination schemes used, the Court is using the PDF page number found at the top of the page for

the docket entry, rather than the document's pagination.

7. "Petitioner was denied effective assistance of counsel after formal charge where her

The Court has reviewed the P.L.A. from Petitioner's direct appeal (Petitioner's P.L.A. [d/e 9–9]) and the P.L.A. from state post-conviction proceedings (Petitioner's P.L.A. [d/e 9–17]) and the Court cannot locate this claim.

■ Petitioner has not shown cause and prejudice for this default. This procedural default will not result in a fundamental miscarriage of justice.

Therefore, the claim is procedurally defaulted.

In any event, the Court would have denied it on the merits, because trial counsel did seek to suppress the statements. *See* Suppression Filings [d/e 9–1], p. 40 et seq.; Suppression Hearing Transcript [d/e 9–2], p. 3 et seq. (approximately 200 pages).

### D.

■ Claim Five[8] is procedurally defaulted as well.

Petitioner claims that trial counsel was ineffective for failure to make a contemporaneous objection to allegedly inappropriate arguments made by the prosecution.

The Court has reviewed the P.L.A. from Petitioner's direct appeal (Petitioner's P.L.A. (Exhibit Q) [d/e 9–9]) and the P.L.A. from state post-conviction proceedings (Petitioner's P.L.A. (Exhibit LL) [d/e 9–17]) and the Court cannot locate this claim. It was never presented to the Supreme Court of Illinois.

■ Petitioner has not shown cause and prejudice for this default. This procedural default will not result in a fundamental miscarriage of justice.

Therefore, the claim is procedurally defaulted.

court-appointed attorneys made no attempt, by motion to suppress, objection, or otherwise, to preclude the use by the prosecution of Petitioner's custodial statements."

### IV.

All but one of the remaining claims relate to prosecutorial misconduct.

### A.

Most of these claims relate to allegations that the prosecutors made improper and prejudicial comments in closing arguments. The Supreme Court has stated that "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

The Court of Appeals has stated that "[i]n reviewing a claim of prosecutorial misconduct, we consider first whether the challenged remark by the prosecutor was improper, and, second, whether it prejudiced the defendant." *United States v. Wescott,* 576 F.3d 347, 355 (7th Cir.2009).

■ "While prosecutors may not infuse their closing arguments with facts that the court has not admitted into evidence, they may argue reasonable inferences from the evidence that the jury has seen and heard." *United States v. Waldemer,* 50 F.3d 1379, 1383 (7th Cir.1995).

■ "The reasonable inference limitation provides a sufficient safeguard against prosecutorial abuse. The term 'reasonable inference' must be defined contextually. Whether the evidence bears logical and proximate connection to the point the prosecutor wishes to prove are perhaps the most obvious considerations in determining whether the inference is rea-

**8.** "Petitioner was denied effective assistance of counsel when her trial attorneys failed to object to highly prejudicial conjectural jury argument by the prosecutor."

sonable. Also important is whether the prosecutor makes the argument solely to inflame the passions of the jury." *Id.* at 1384.

### B.

In Claim Three, it is alleged that "Petitioner was denied due process of law where the trial prosecutor argued to the jury contentions which were known by the prosecutor to be false."

### 1.

During the trial, Petitioner took the stand and testified regarding her motivation for giving law enforcement contradictory and untrue statements during her post-arrest interviews.

She testified that she was extremely nervous because of how she was threatened by Detective Thomas Erickson of the Kankakee County Sheriff's Department. She alleged that he threatened her before she gave her statement at the Bourbonnais Police Station on September 4, 1987.

The following comes from the trial transcript:

Q. *Later on, approximately about eleven A.M. back in Bourbonnais—*

A. Yes.

Q.—did Officer McClellan and Gilbert commence to question you?

A. Yes, they did.

Q. Prior to that questioning, did you have occasion to be addressed by another police officer?

A. Yes, I was.

Q. Who was that officer?

A. I believe he is a detective. Detective Erickson.

Q. All right. Can you describe him?

A. I will never forget him. He is about six foot four. Maybe two hundred fifty pounds.

Q. What did he say to you?

A. He came into the room and he said, "Young lady, do you realize your next seat could be the electric chair?".

Trial Transcript [d/e 9–7] pp. 232–33.

On cross-examination, she testified as follows:

Q. Now, I think you said that someone by the name of Detective Erickson said something to you?

A. Yes, he did.

Q. Okay. You have seen him at the Detention Center, is that correct?

A. Yes, I have.

Q. He is a big man?

A. He is a big man, yes.

Q. And you say that Detective Erickson said something to you at the Bourbonnais Police Department, is that correct?

A. Yes, he did.

Q. Are you sure it wasn't any place else?

A. No. That first room I was in, that is where he said it.

Q. He walked up to you and he said what?

A. He walked in the room behind the desk and he said "Young lady, do you realize your next seat could be the electric chair?".

Q. This was right after you were brought in?

A. I would say five, ten minutes after I was brought into that room.

Q. Okay. Was it right after you were brought into the Bourbonnais Police Department?

. . .

A. Yes.

Q. Was this before the first statement or after the first statement?

A. It wasn't after. I think it was during or before.

Q. Was there anybody else in the room when this man said this to you?

A. Yes, there was.

Q. Who was that?

A. Elizabeth.

Q. Elizabeth?

A. Lamanna.

Q. Lamanna?

A. Yes. I don't recall if Gilbert was in there or not.

Q. Just walked up to you and said do you realize young lady your next seat could be the electric chair, right?

A. Yes.

Trial Transcript [d/e 9–7] pp. 269–271.

The prosecution called Detective Erickson as a rebuttal witness, who testified that he had never before met the Petitioner, and that he was not at the Bourbonnais Police Station on the date in question. *See* Trial Transcript [d/e 9–8], pp. 19–22. He also testified as to his whereabouts that day. *Id.* The prosecution introduced radio logs from the Kankakee County Sheriff's Department confirmed his whereabouts. *Id.* at 23.

The cross-examination consisted of double checking that Detective Erickson did not go to the Bourbonnais Police Department, and trying to highlight instances where Detective Erickson had not been very thorough in his reports. *Id.* at 25–31.

Detective Erickson was understood by all to be the largest law enforcement officer in Kankakee County at that time. He was six feet, eight inches tall, and weighed 285 pounds. *Id.* at 22.

He was the last witness of the entire trial.

In closing arguments, the prosecutor stated the following:

Now the evidence in this case makes one thing clearer than any other fact. That this woman is an absolute pathological liar. From the minute she opened her mouth when she was arrested till she stopped talking on Tuesday all she could do was lie. She lied often, she lied repeatedly. How do you know she is a pathological liar? Well the evidence tells you that. You have heard the evidence and that is what it shows you. But once again there is a better test than what other people come in and tell you happened. You got to see her. Each and every one of you got to listen to her. And besides your observations what can you rely on in making that determination? What kinds of things help you? Well how about when she admits to you oh yeah I lied, I lied in that statement, oh sure I lied about that—she freely admits it. She smiles as she says it. With her little giggles as she testifies. No big deal, it is only a lie.

Trial Transcript [d/e 9–8], p. 36.

Defense counsel responded as follows:

She comes downstairs, police all over the residence, inside and out, street's blocked, she is taken away, brought to a small room, a huge policeman says do you realize the seriousness of this, your next seat could be the electric chair. Now Nancy Rish could have done something here that would have made it impossible for the State to present an Erickson this morning, she could have just said a policeman leaned in to the office and told me that. But remember she has not been arrested before, she has not been in custody before—Erickson this morning himself said he's never talked to her before. But what does she describe in detail—a huge policeman. Erickson....

. . .

But the key thing I want you to recall on that issue is why would she remember in such vivid detail? For the same reason she could probably remember the hollow-tipped bullets in that chamber of the revolver that was pointed toward her because it represented death. And by his own admission the biggest policeman in the County—she could have said some plainclothes man walked in, said you are facing the electric chair, Hon.

*Id.* at 98–99.

The prosecutor said the following in rebuttal:

I want you to remember what kind of liar she is. How much she is willing to lie. How easy the lies come. How she will mix the truth with a lie to make it sound better.... The lies were designed, concocted to protect her, nobody else. When she was confronted with a lie she said yeah I lied, but Danny told me to.... I said, "Nancy when you lied to Sgt. McClellan and, and Detective Gilbert you lied to deceive them so they would let you go home right out that door, isn't that true?" "Yes", she said. And I asked the question over and over again. So they would let you go home. Scared, upset, yeah I imagine she was. But she was guilty, she was caught, she was seen, she was identified. She was guilty.... She'd like the tears of deceit to wash away your common sense. She'd like to cover it with confusion. Is this a fragile woman you saw on the witness stand? No. It is a cold, callous, cunning liar. Protecting herself. Innocent people don't lie, they don't. They don't fabricate, they don't elaborate, they don't concoct, they don't deceive. It is a pretty basic principle, innocent people don't forget important facts like boxes, and recorders, and phone calls, unless they are guilty people. Innocent people don't need to make up lies, or excuses to explain. The best example— sometimes I really believe that divine

[providence] steps in—was Detective Erickson. How important was that lie to Nancy Rish? The whole tenor of this portion of the defense is she is scared. Someone said she is going to the electric chair, of course you know that is not a consideration, that is not the penalty here. This is not a death case for Nancy Rish. Why did she need that? Why Detective Erickson—because he is the biggest—and what does Nancy do—she goes for the biggest lie. If you are going to be afraid of somebody make them big. There is no doubt in your mind that she sat before you and lied. That one lie alone—forget about this long string of lies, forget about it. That one is good enough for you not to believe her. And at the time wasn't even involved. At the time it was said—in case you have any doubts in your mind we are not talking about any doubt, we are talking about reasonable—any doubt in your mind she said he told her that she was facing the electric chair. Her next seat would be the electric chair. Stephen Small wasn't even known to be dead yet. His body wasn't even recovered at that time. There was no murder.

*Id.* at 133–34.

### 2.

After the trial concluded the case was featured on a television program. The program—"Top Cops"—featured a dramatization of the events of the case. Illinois State Police Sergeant William Willis appeared at the beginning and end of the segment, and provided some voiceover. Otherwise, the case was portrayed by actors. The actor portraying Willis is shown threatening Petitioner with the electric chair.

In her post-conviction petition, the Petitioner claimed that the prosecutors had

engaged in misconduct at trial for forcefully attacking her testimony that Detective Erickson had made the threats. The Petitioner argued that Willis had, in fact, threatened Petitioner and that knowledge of this alleged threat was imputable to the prosecution. She claimed that they had made knowingly false allegation of perjury, in violation of her rights.

Initially, the Circuit Court of Kankakee County dismissed this claim, after assuming that the Willis had issued the threat. The Circuit Court held the following:

> For the purpose of this Motion to Dismiss, the Court has accepted as true that Mr. Willis actually made the statements in question.
>
> . . .
>
> The Defendant created this problem by misidentifying the maker of the threat. If she had correctly identified Sergeant Willis, the State would have confronted him, and the truth would have come out. If she had not identified any one at all, and merely said it was a policeman, the State could then have inquired of everyone involved in the investigation. But when she says it was Detective Erickson and Erickson denies it, there is no obligation on the State to then conduct a further investigation of anybody involved in her questioning. This Court has seen Sergeant Willis testify in court. He is nowhere near the size of Detective Erickson. There is no explanation in the record how the Defendant came to identify the maker of the alleged threat of Detective Erickson.
>
> Ms. Rish identified Erickson, Erickson denied it, and the State put Erickson on the witness stand to let the jury decide who to believe. At that point, the State was entitled to argue its version of the facts to the jury. There is no evidence that the prosecution knew Mr. Willis had made such a statement. There is no justification for imputing it

to them on the facts presented by the Post–Conviction Petition. This Court does not believe the State had any obligation to question every witness who might have been involved in Defendant's questioning when the Defendant positively identified Detective Erickson as the maker of the statement. The Court also notes that the jury is instructed at the end of the case that what attorneys say is not evidence and that any argument not based on the evidence or a reasonable inference therefrom must be disregarded. The Court must presume that the jurors follow its instructions.

Circuit Court Order [d/e 9–11], p. 11.

The decision was reversed by the Appellate Court, which stated the following:

> Contrary to defendant's contention, knowledge by police officers is not automatically imputed to the prosecution in a per se manner. Rather, the imputation requires an individualized focus on the factual circumstances. Among the factors to be considered would be the reasonableness of such imputation, whether the failure to transmit such knowledge up the informational chain was inadvertent or intentional, and whether any real prejudice occurred.
>
> In this case we are uncertain whether Willis' knowledge should be imputed to the prosecution. One factor weighing against such attribution is that defendant helped to create the problem by misidentifying the maker of the statement as Detective Erickson. . . .
>
> . . .
>
> On the other hand, because no evidentiary hearing was held, we do not know whether Willis intentionally hid his knowledge from the prosecution, nor do we know whether he told any other officers or investigators about the incident. Under the circumstances, we believe that an evidentiary hearing is necessary.

We therefore reverse the dismissal of count four of defendant's post-trial conviction and remand for such a hearing. *People v. Rish,* 344 Ill.App.3d at 1115–16, 280 Ill.Dec. 575, 802 N.E.2d 826 (citation omitted).

On remand, the Circuit Court of Kankakee County held an evidentiary hearing. The Petitioner sought to get into evidence a "transcript" related to the television program. It was purportedly a rough transcript of a conversation between Willis and a producer of the television show.

In relevant part, the "transcript" says the following: "Then I go in and talk to Nancy. She says I don't know nothing. Playing that shit. I tell her 'Next seat you might be sitting in is a hot seat.' She says, 'Huh?' I said, 'Electric chair girl. If this guy dies, you're going down. We're going to ask for a death penalty.' Later in the trial she accuses some guy 6 foot 7 of doing this. I'm 5–10." *See* "Transcript" [d/e 9–17], p. 94.

The ruling of the Circuit Court is excerpted as follows:

In her petition, Defendant now claims that the "electric chair" threat was actually made by Sgt. William Willis, not Detective Erickson, and that the Prosecutors knew, or should have known this when they made their closing arguments. At trial, Ms. Rish testified that the maker of the threat was 6'4" and weighed 250 pounds. Sgt. Willis testified he is 5 feet, ten inches tall, and weighs 205 pounds. Detective Erickson testified he was 6 feet, eight inches tall and weighed 285 pounds. The Defendant did not testify in these proceedings, so there is still nothing in this record to explain such a gross and obvious identification error.

In its earlier opinion, for the purpose of ruling on the State's motion to dismiss, this Court assumed Sgt. Willis made the "threat". This Court has made no such assumption this time, as this was an evidentiary hearing.

At this hearing, the Defendant first tried to admit, as substantive evidence, a document entitled "Bill Willis Transcript". While this Court allowed it to be used for impeachment purposes, it was denied admission as substantive evidence, for reasons set out in the record. At the March 11 hearing, the Defendant produced a videotape copy of the "Top Cops" television program, and moved it be admitted as substantive evidence pursuant to ILCS 725/115–10.1. This Court allowed that motion over the State's objection, based upon 115–10.1, and because Sgt. Willis referred to the program in his testimony, and appears in the tape at the beginning and end, so that it is in a sense, self-authenticating. This Court ruled that the actual words spoken by Sgt. Willis on the tape, would be considered as evidence and weighed against his testimony at this hearing. However, it was made clear that this Court would not attribute the words of the actors to Sgt. Willis in the absence of proof that he had some control over what they said.

Having viewed the tape, the Court makes the following observations:

1. The tape is not of the best quality, and has obviously been edited.

2. It is clear that it is *not* a documentary.

3. That none of it was filmed at any of the actual locations in this case.

4. That, aside from Sgt. Willis, all the persons appearing in the program are actors.

5. That Sgt. Willis appears briefly at the start, and at the end of the program, and does some "voice-overs" during the program.

6. That *nowhere* on the tape does Sgt. Willis *ever* say that he threatened Nancy

Rish with going to the electric chair. The actor playing him does say it one scene.

7. That in a voice-over, Willis does say that he talked to Nancy Rish.

8. That Sgt. Willis testified, without contradiction, that he was told by the producers of the program that it was not a documentary and would be a fictionalized account of the event. He testified that he was given a script to read, and had no control over the show's content. He testified that he advised the producers of 3 serious inaccuracies in the program, including that he spoke to Nancy Rish, (which Willis denies) and was told to follow the script.

9. That there are two other glaring factual inaccuracies in the program. First, in the program, the search warrant is executed on the Defendant's home at night. That is wrong. The record here clearly shows that the search warrant was executed at 10:30 a.m., in broad daylight. More significantly, in the program Sgt. Willis is at the scene when the police dug up Mr. Small's body. That never happened. Sgt. Willis wasn't there, he was at the command post. Willis testified that he told the producers this was wrong, and they didn't correct it.

These inaccuracies, and the producers' refusal to correct them, prove that the program was a fictional account of the event, and not a factual documentary. They also support Willis' contentions that he had no control over the show's content. There is no evidence that Willis had any control over the content of the program, including the words he spoke. In fact, the evidence is exactly the opposite.

It is the Defendant's burden to prove that Sgt. Willis made the electronic chair threat. That is what the Defendant alleged in her petition. This Court has examined the evidence and considered the testimony. In this regard it must be noted that, aside from the allegations of her petition, Ms. Rish herself has never testified that Sgt. Willis made that threat. This Court now finds that Sgt. Willis did not make the electric chair threat to Ms. Rish.

Even if the Defense could prove the threat was made, they would still have to show how the knowledge of that threat should be imputed to the prosecutors. Defendant now admits that the trial prosecutors had no actual knowledge of an electric chair threat. All three trial prosecutors have denied, under oath, having any such knowledge. The Defense argument is that, despite the fact that Ms. Rish swore under oath that Det. Erickson made the threat, the State should have done more than just confront Erickson about it, they should have questioned everybody involved with the investigation. This Court is unaware of any case which so holds, and Defendant didn't cite any such case to the Court.

Finally, even if the Defendant proved a threat, and established that knowledge of it should be imputed to the State, the Defendant would still have to show that rose to the level of a constitutional violation. As this Court stated in its previous opinion, in judging a closing argument, it must be considered as a whole. This was one part of a very large argument, it must be considered as a whole. This was one part of a very large argument conducted by two different prosecutors. The jury was instructed at the end of the case that what the attorneys say is not evidence, and that any argument not based on the evidence or a reasonable inference therefrom must be disregarded. The Court must presume that the jurors follow its instructions. There is no proof here of a reasonable

probability that this argument affected the outcome of the trial.

For all the reasons stated above, the Court finds that this claim should be denied.

Circuit Court Order [d/e 9–15] p. 185–88.

The Appellate Court of Illinois affirmed the ruling:

In this case, the petitioner's due process claim is predicated upon a fictional portrayal of this case's criminal acts and associated investigation. Standing alone, nothing in the "Top Cops" episode can be read as proof that the petitioner was threatened with the electric chair, let alone by Willis. The "Bill Willis Transcript" which purported to show that Willis admitted to making the threat, was properly excluded from evidence, as the document could not be authenticated and constituted inadmissible hearsay. Further, Willis testified that he never made the threat, and that he objected to the episode's portrayal of him threatening the petitioner with the electric chair. The circuit court deemed Willis' testimony to be credible, a finding clearly supported by the evidence.

We agree with the circuit court that the petitioner failed to establish that she was in fact threatened with the electric chair just prior to custodial interrogation. Without proof of the threat, it cannot be said that the prosecution knowingly made false allegations of perjury against the petitioner. Under these circumstances, we hold that the circuit court did not err when it found that the prosecution did not violate the petitioner's due process rights during closing arguments.

Appellate Court Opinion [d/e 9–17] pp. 24–25.

3.

Petitioner renews her claim in this forum. *See* Petition [d/e 1], pp. 46–57; Reply [d/e 12]; pp. 24–30.

 It is interesting that in the statement of the facts, the Petitioner states that it was, in fact, Detective Erickson, and not Sergeant Willis, who made the electric chair threat. *See* Petition [d/e 1], pp. 27–28, ¶ 92.

The state courts found, after excluding the "transcript" for evidentiary reasons and holding an evidentiary hearing, that Willis did not make the threats. The courts also found that the prosecutors were caught off-guard by Petitioner's testimony regarding Erickson, and they testified that at the close of the trial that they had no reason to believe that Willis had threatened Petitioner.

In many respects Petitioner has presented this claim almost like a general appeal, seeking almost de novo review of the issue, without pointing out how the claim goes forward under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

After fully considering the record, the Court concludes that the Petitioner is unable to demonstrate that the adjudication of this claim in the courts of the State of Illinois (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2).

Therefore, this claim must be denied.

C.

 In Claim Four, it is alleged that "Petitioner was denied due process of law

where the prosecutor manufactured, and vividly argued to the jury, a highly prejudicial allegation out of pure speculation and conjecture and entirely without evidentiary support."

At trial, Mr. Small's son testified that two people called the home on the night of the kidnapping. He testified that he could not determine the gender of the caller who lured Mr. Small out of his home with the lie regarding Mr. Small's Frank Lloyd Wright-designed house. *See* Trial Transcript [d/e 9–3], p. 110. The son testified that the caller had a deep, low voice and that it was different from the caller who demanded a ransom payment. *See id.* at 110, 114.

On cross-examination, the son was asked whether he recalled testifying on a previous occasion that the "second call sounded like *another* male." *Id.* at 116 (emphasis added). He confirmed that he had so testified. *Id.*

In closing arguments, one of the prosecutors suggested that it was the Petitioner who made the phone call to lure Mr. Small out of his home:

> Well, let's examine the evidence. You have to get Stephen Small from the sanctity of his home. You can't make your million unless you get him out the door. You have got the box, and now you need the man. Who do you pick to lure him from his house? Danny Edwards on the phone—no. You need someone who could sweet-talk him out, fast on their feet, an accomplished liar, an actress, someone who could convince the man to leave his house at 12:30 at night and respond to a burglary. You heard her lie on tape, you heard her lie in person, you told—you heard the elaborate details she is capable of getting into. You heard Ramsey Small, a young boy who lost his father, tell you that the caller who made the 12:30 call was different. It was a different voice....

> ...

> ... Oh what a tangled web we weave when we practice to deceive. Aid, abet. Right there on the phone sweet-talking Nancy, the spider to the fly, come on, come on out, my million's waiting for me.

Trial Transcript [d/e 9–8], pp. 125–26, 128.

Petitioner argues that the prosecutor committed misconduct, because his argument was conjecture and without any evidentiary support. The Petitioner suggests that should not have made these arguments in light of the previous statements made by Mr. Small's son, in particular the caller's gender.

This claim was denied by the Appellate Court of Illinois: "However, we have reviewed the arguments propounded by the defendant in regard to both of these alleged acts of misconduct and find them to be without merit." *People v. Rish,* 208 Ill.App.3d at 770, 153 Ill.Dec. 69, 566 N.E.2d 919; Petitioner's Appellate Brief [d/e 9–8], p. 192. This determination is considered an adjudication on the merits for the purposes of AEDPA, and must not be disturbed unless the state court failed to properly apply Supreme Court precedent or reached an unreasonable determination of the facts. *See Muth v. Frank,* 412 F.3d 808, 815 (7th Cir.2005) ("AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court."); 28 U.S.C. § 2254(d).

It does not appear that the courts of Illinois improperly interpreted or applied Supreme Court precedent or unreasonably determined any facts.

Moreover, on the merits, it seems that the arguments of the prosecutor were based on reasonable inferences from the facts of the case. Ultimately, it was up to

the jury to determine whether the evidentiary support for this argument was strong enough.

This claim is denied.

### D.

In Claim Six, Petitioner claims that "Petitioner was denied due process of law where the prosecutors argued to the jury a highly incriminating theory which they knew of should have known was based upon speculation and conjecture and was entirely without evidentiary support."

In this claim, Petitioner claims prosecutors engaged in misconduct when they argued that Petitioner's alleged attempts to purchase bottled water were enough to convict her of aiding and abetting in the kidnapping and murder. Small was found with a bottle of clear liquid. However, the prosecutors had learned from a lab report shortly before trial that, due to a contamination issue, the forensic scientists could not determine what the clear liquid substance was.

The Appellate Court of Illinois stated the following in post-conviction proceedings:

We next consider defendant's challenge to the dismissals of counts nine and ten of her post-conviction petition. Count nine argued that a *Brady* violation occurred when the State made a knowing false argument to the jury in its closing arguments regarding her alleged purchase of distilled water. Count ten also averred a *Brady* violation in closing arguments because of the State's failure to disclose a laboratory report relating to the distilled water.

One week prior to trial, the Illinois State Police forensic science laboratory returned a report to the State's Attorney's office that no analysis of the liquid found in the jug next to Small's body could be done because of possible contamination of the sample by the forensic science laboratory equipment. Defendant asserts that the report would have enabled the defense to impeach the connection between herself and the liquid found in the box where Small had been buried.

We believe the State committed a discovery violation when it failed to hand over the laboratory report to the defendant. Defendant requested the results of any testing pertinent to the case, and the attending forensic scientist was disclosed by the State as a possible witness. However, we find that the State's failure to divulge the report was not material within the meaning of *Brady*, because even had the report been divulged, there is no reasonable probability that it would have affected the outcome of the proceedings. *See* [*Pennsylvania v.*] *Ritchie,* 480 U.S. [39] at 57, 107 S.Ct. [989] at 1001, 94 L.Ed.2d [40] at 57 [ (1987) ] (evidence is material only if there is reasonable probability that results of proceeding would have been different).

Three witnesses testified concerning the issue of distilled or bottled water. Linda Forestier, a hardware store clerk, testified that a man and woman similar in appearance to Edwards and the defendant entered the store together on or about August 31, 1987. The woman asked if the store sold distilled water. Forestier replied that it did not and directed the couple to a grocery store. On cross-examination, Forestier was unable to identify the defendant as the woman in the store that day.

Donna Jordan, an employee of Convenience Food Mart in Bourbonnais, testified that defendant, who was a regular customer, came into the store with a man who asked for bottled water. This occurred between August 29 and September 1, 1987. On cross-examination, Jordan stated that she was not sure that the defendant was in the store on the

same night that the man came in to buy the water.

Arlene Bires, a clerk at Ruffin's Super Value in Aroma Park, testified that on September 3, 1987, Edwards came into the store and bought a few gallons of water and five or six candy bars. The defendant was not with Edwards.

The jug found with Small's body was not placed into evidence at trial by either party. Although the State informed the jury that some water was found with Small, no connection was ever established between the water the co-defendant purchased, and the water found in the box. Neither party focused on the water in closing arguments. Given the extremely low probative value of the testimony concerning the water, we do not believe that the State's failure to disclose the laboratory report had any impact on the trial. Accordingly, we affirm the dismissal of counts nine and ten of defendant's post-conviction petition.

*People v. Rish*, 344 Ill.App.3d at 1116–17, 280 Ill.Dec. 575, 802 N.E.2d 826.

Petitioner argues that the prosecutors' "arguments to the jury asserting that Petitioner aided in purchasing bottled water used in the kidnapping went so far beyond the evidence, and so far into the realm of speculation, as to mislead the jury and to urge upon it an impermissible basis for conviction." Petition [d/e 1], p. 67.

The Court has reviewed the relevant portions of the Trial Transcript [d/e 9–8] containing the closing arguments of the prosecution. The Court is unable to conclude, with respect to this claim, that the courts of Illinois have either (1) rendered a decision in violation of clearly established federal law (as determined by the Supreme Court), or (2) rendered a decision based upon factual findings that were unreasonable in light of the evidence presented. Therefore, this claim must be denied.

### E.

In Claim Seven, Petitioner argues that "This cause should be reversed and remanded for a new trial because Nancy Rish was denied a fair trial by prosecutorial misconduct."

Petitioner makes two claims.

First, that there was no direct evidence of guilt, and, as a result, the prosecutors improperly used circumstantial evidence and an aiding and abetting theory to secure conviction. In making this claim, Petitioner reargues some of the issues discussed above.

Second, the Petitioner claims that the prosecutors improperly argued to the jury that defense counsel was trying to confuse the jury.

In making these claims, the Petitioner has failed to cite any federal authorities.

■■■ A state prisoner cannot prevail under 28 U.S.C. § 2254 on a theory that prosecutors failed to abide by state law norms of conduct. *See* 28 U.S.C. § 2254(d) (relief barred unless state court adjudication was "contrary to, or involved an unreasonable application of clearly established Federal law"); *see also Greene v. Fisher*, —— U.S. ——, 132 S.Ct. 38, 43, 181 L.Ed.2d 336 (2011) (standard found at § 2254(d) is difficult to overcome because federal habeas "functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction").

This claim is dismissed, because the Petitioner has failed to state a claim for relief.

### V.

Petitioner's final claim is that "Evidence relevant to Petitioner's conflict of interest claim and alleged threats to Petitioner by

law enforcement agents claim violated the due process rights of the Petitioner."

It is unclear what Petitioner means by this statement.[9]

In the body of the argument, the Petitioner first reargues her belief that the prosecutors committed misconduct in relation to the alleged death penalty threats. This claim has been addressed above, and it has been determined that Petitioner is not entitled to relief.

■ Second, the Petitioner argues that the state courts erred in determining that pre-indictment counsel did not labor under a conflict of interest when he represented the Petitioner while she was in custody and was being actively interrogated. This claim is without merit.

The attorney who represented Petitioner had some minor social contacts with Mr. Small and his family, like most other professional people in Kankakee.

Also, he had years earlier represented in a divorce an officer who was working on the case. They shook hands and greeted each other on the attorney's way into the Bourbonnais Police Department to meet the Petitioner. During this exchange, the attorney asked the officer where the Petitioner was being held. The state courts did not err in finding that these contacts did not create a conflict of interest.

This claim is denied.

### VI.

■ "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing Section 2254 Proceedings. "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "An applicant has made a substantial showing where reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir.2008) (quotation marks omitted).

■ Reasonable jurists would not dispute that Petitioner Rish is not entitled to relief. Accordingly, the Court will not issue a certificate of appealability. If Petitioner wishes to appeal this Court's ruling, she must seek a certificate of appealability from the Court of Appeals under Federal Rule of Appellate Procedure 22.

### VII.

*Ergo*, Petitioner Nancy D. Rish's Petition for Writ of Habeas Corpus [d/e 1] is DENIED.

The Clerk is directed to notify the Petitioner.

The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

---

9. The Respondent has responded as follows: "How 'evidence' violates petitioner's due process right is not explained, and petitioner's argument in support of this claim does little to elucidate the issue." Response [d/e 8], p.

78. The Respondent asks the Court to dismiss the claim as insufficiently pled under Rule 2(c) of the Rules Governing Section 2254 Cases. The Petitioner failed to address any issue related to this claim in her Reply.